**KNIGHTS OF COLUMBUS, COUNCIL # 94, LEXINGTON, MASSACHU-SETTS and Michael J. O'Sullivan, Individually and as Grand Knight of the Knights of Columbus, Council # 94, Lexington, Massachusetts, Plaintiffs,**

v.

**TOWN OF LEXINGTON, and Jeanne K. Krieger, Chairman, and Catherine M.D. Abbott, Elizabeth B. Eddison, Peter D. Enrich, and Dawn E. McKenna, the Board of Selectmen of Lexington, Massachusetts, Defendants.**

No. 00–CV–12360–NG.

United States District Court, D. Massachusetts.

Dec. 6, 2000.

---

Chester Darling, Boston, MA, for Plaintiffs.

Daryl J. Lapp, Palmer & Dodge, Boston, MS, for Defendants.

### *MEMORANDUM*

GERTNER, District Judge.

This case began when the Knights of Columbus, Council # 94, and Michael J. O'Sullivan, individually and as Grand Knight ("plaintiffs") applied to place a display of the crèche (Nativity Scene) on the Battle Green at Lexington Common ("the Green") during this Christmas season. Plaintiffs' application was denied due to regulations, promulgated by the defen-

dants,[1] which proscribe "[p]lacement on the Battle Green of any unattended structure."[2] In this action, plaintiffs challenge the constitutionality of these regulations, claiming they impermissibly restrict protected speech and religious exercise. Plaintiffs therefore ask this Court to issue an order preliminarily enjoining enforcement of the regulations.

This case raises important issues. The First Amendment's protection of speech and religious exercise implicates core concerns of our democracy. Nevertheless, after listening to counsels' arguments and carefully reviewing the record, I find that the plaintiffs do not meet the appropriate legal standards for invalidating legislative actions. Accordingly, plaintiffs' Motion for a Preliminary Injunction [Docket # 4] is **DENIED.**

## I. *BACKGROUND*

The Battle Green is the center of Lexington town life. In a typical year, events on the Green include religious services, fairs, re-enactments, celebrations, and rallies. In addition, for the better part of the past century, a crèche has been displayed on the Green during the Christmas season. Until the early 1970s, the Town sponsored the erection, care, removal, and storage of this crèche. In the early 1970s, however, after Lexington citizens and clergy raised concerns about the appropriateness of the Town's role in displaying the crèche, the Board of Selectmen ("the Selectmen") transferred ownership and maintenance of the crèche to two fraternal orders, the

Knights of Columbus, Council # 94, and the Simon W. Robinson Lodge, Ancient Free and Accepted Masons (the "Masons").[3]

Recently, display of the crèche on the Green again became controversial, because some Lexington residents felt its central and public location indicated continued Town endorsement of the Christian symbolism of the crèche. In part to publicize their concerns, these residents applied to the Selectmen for permits to display other objects on the Green, including a 4-foot by 8-foot sign to protest the placement of the crèche, a sukkah[4] to honor the Jewish holiday of Sukkoth, a herd of cows to celebrate Hinduism, and a pyramid to honor the Egyptian Sun God, Ra.

The Selectmen recognized that if they allowed the crèche, they would also have to permit each of these other displays, to avoid endorsing any particular religion in violation of the First Amendment of the U.S. Constitution. On the other hand, the Selectmen worried that allowing such a variety of unattended structures (and livestock) to clutter the Green would disturb the historic ambience of the area and detract from residents and tourists' experience of the Town. Accordingly, the Board revised its regulations to prohibit the placement of unattended structures on the Green, thereby outlawing the crèche and any other unattended display, religious or otherwise. Importantly, however, the new regulations do allow, subject to a permit requirement, "[d]isplays of a ceremonial

1. At the hearing on this matter, plaintiffs presented historic documents that, they alleged, indicate that residents of Lexington, rather than the Town itself, own the Green. Plaintiffs suggest that this issue of ownership somehow calls into question the Board's authority to enact the challenged regulations. This argument is unavailing. The Selectmen are the elected representatives of the Town residents, and the Town By-Laws specifically charge the Selectmen with "Protection of the Battle Green." Thus, as long as the challenged regulations are lawful and constitutional, they do not exceed the authority of the Selectmen.

2. Lexington Rules and Specifications Regulating the Use of the Battle Green 4(p) [hereinafter "Lexington Rules"].

3. Notwithstanding that transfer, the crèche continued to enjoy preferential treatment by the Town. Although Town regulations have long required a permit for displays of this nature, the Town did not require a permit for the annual erection of the crèche.

4. A sukkah is a large, open, hut-like structure.

nature in connection with special events and limited in duration to the period required for such events [up to a maximum of eight hours]." Lexington Rules 3(b)(iv).

After these regulations were adopted, the Selectmen constructively denied plaintiffs' application for a permit to erect and display the crèche on the Green from December 3, 2000 to January 6, 2001. At the same time, the Selectmen indicated to the plaintiffs that an application to display the crèche during a celebration for an eight-hour period would be approved, but plaintiffs refused to amend their permit application.

Plaintiffs claim the revised Town regulations amount to an unconstitutional, content-based infringement of their freedom of speech and religious exercise. They urge this Court to issue an order preliminarily enjoining enforcement of the regulations, and consequently permitting erection and display of the crèche on the Green throughout the Christmas season.

## II. *FINDINGS*

### A. *Preliminary Injunction Standard*

■ Before this Court may grant a preliminary injunction, the moving party must establish that "(1) it has a substantial likelihood of success on the merits, (2) there exists, absent the injunction, a significant risk of irreparable harm, (3) the balance of hardships tilts in its favor, and (4) granting the injunction will not negatively affect the public interest." *TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 544 (1st Cir.1996). The First Circuit regards the first of these four factors, substantial likelihood of success on the merits, as "critical in determining the propriety of injunctive relief." *Lancor v. Lebanon Hous. Auth.*, 760 F.2d 361, 362 (1st Cir. 1985).

■ For the reasons discussed below, I find that plaintiffs are unlikely to succeed on the merits of their Complaint. As a result, I need not reach the other prongs of the preliminary injunction inquiry. *Cf. Public Serv. Co. of New Hampshire v. Town of West Newbury*, 835 F.2d 380, 383 (1st Cir.1987) ("Because of our analysis as to irreparable harm, we need not reach the question of likelihood of success on the merits.").

### B. *Likelihood of Success on the Merits*

To evaluate the likelihood that plaintiffs will succeed on the merits of their Complaint, I must first decide whether the new Lexington regulations limit speech based on its content, or based only on its duration, location, and manner. This decision, in turn, indicates the appropriate level of judicial scrutiny to be applied to the regulations. Finally, I must evaluate whether the regulations survive that level of scrutiny.

#### 1. *The Lexington Regulations Are Content–Neutral*

■ One of the most important questions to answer in cases challenging government regulation of speech is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). The Lexington regulations challenged here easily pass this test for three independent reasons:[5] (1) the new regulations are content-neutral on their face; (2) they were not adopted due to disagreement with the message conveyed by the crèche (or by any other expressive display or activity); and (3) the Selectmen's interest in protecting the historic and aesthetic qualities of the Green is unrelated to the content of any unattended structure that might be displayed thereon.

#### a. *The regulations are facially neutral*

The new regulations challenged by plaintiffs proscribe "[p]lacement on the

---

5. *E.g. Hill v. Colorado,* 530 U.S. 703, 120 S.Ct. 2480, 2491, 147 L.Ed.2d 597 (2000)

(analyzing content-neutrality along three independent lines).

Battle Green of any unattended structure," but allow (subject to a permit requirement) "[d]isplays of a ceremonial nature in connection with special events and limited in duration to the period required for such events."[6] They do not ban all expressive structures, but only "unattended" structures, or structures left in place for more than eight hours. They permit anyone to erect a cross, build a pyramid, or graze a herd of cows on the Green, as long as none of these displays is left unattended, or left in place for too long.

Thus, there is no question that the regulations are neutral on their face, as permission to place a particular structure on the Green does not hinge on its subject-matter but solely on the manner and duration of its display.

### b. *The Selectmen did not adopt the new regulations due to disagreement with the message conveyed by the crèche*

 In spite of the content-neutral language of the revised regulations, plaintiffs nevertheless claim the regulations are content-based because they were enacted "solely to prevent the display of the crèche on the Green." I disagree. I believe plaintiffs misinterpret the minutes of the Board of Selectmen meetings at which the crèche and the new regulations were discussed, and thus misconstrue the Selectmen's concern over the crèche for a more insidious disagreement with the message the crèche conveys.[7]

**6.** Lexington Rules 4(p), 3(b)(iv).

**7.** In any case, the comments of some Selectmen highlighted by the plaintiffs are not enough to invalidate the regulation. It is not the role of a court to "void a [regulation] that is, under well-settled criteria, constitutional on its face, on the basis of what [a few Selectmen] said about it." *United States v. O'Brien,* 391 U.S. 367, 384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (citing *McCray v. United States,* 195 U.S. 27, 56, 24 S.Ct. 769, 49 L.Ed. 78 (1904)).

 While a court is obliged to consider the purposes served by a regulation limiting

Plaintiffs emphasize the fact that the minutes of Board meetings are replete with references to the "divisive" and "distressing" issue of the crèche. As I read these references, however, they do not indicate that the Selectmen enacted the new regulations to silence plaintiffs' Christian expression. Rather, the Selectmen were concerned that the proliferation of serious and not-so-serious free-standing religious and irreligious displays would threaten the very sanctity of the historic Green.

### c. *The government interest served by the regulations is unrelated to the content of the regulated speech*

My conclusion that the Selectmen adopted the new regulations out of concern for the sanctity of the Green suggests a third reason that the regulations should be considered content-neutral: the Selectmen's interest in preserving the sanctity of the Green is entirely unrelated to the subject-matter of the regulated structures. The Selectmen felt the Green was threatened more by the unattended, long-term display of a crèche, a pyramid, or a herd of cows, than by a Christian, Egyptian, or Hindu prayer vigil of limited duration. Thus, they disallowed the former, but continued to allow the latter—but they did so carefully, in a way that did not relate to the subject-matter content of the regulated speech.

### 2. *The Ordinance Survives Intermediate Scrutiny*

All three of the above, independent lines of analysis thus support my overall conclu-

speech to determine its constitutionality, when a regulation serves a broad and legitimate purpose—as the Lexington regulations clearly do—it is improper for the court to question that purpose simply because some of the legislators who enacted the regulation expressed a more questionable purpose. *Cf. Hill v. Colorado,* 530 U.S. 703, 120 S.Ct. 2480, 2494, 147 L.Ed.2d 597 ("[T]he contention that a statute is 'viewpoint based' simply because its enactment was motivated by the conduct of the partisans on one side of a debate is without support.")

sion that the challenged regulations are content-neutral time, place, and manner restrictions on protected speech. Accordingly, the regulations are constitutional if they survive what the Supreme Court has termed "intermediate scrutiny": they must be "narrowly tailored 'to serve a substantial government interest,'" and they must " 'allow[ ] for reasonable alternative avenues of communication.'" *D.H.L. Associates, Inc. v. O'Gorman,* 199 F.3d 50, 59 (1st Cir.1999) (citing *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (internal citations omitted)).

### a. *The regulations are narrowly tailored to serve a substantial government interest*

As discussed above, I believe the language and legislative history of the challenged regulations amply support the conclusion that the regulations serve primarily to protect the historic and aesthetic qualities of the Lexington Green. Numerous cases confirm that this function constitutes a "substantial government interest." For example, in *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 296, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), the Supreme Court upheld an ordinance banning camping in a District of Columbia park because the regulation served the "substantial interest [of] maintaining the parks in the heart of [the] Capital in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence." *Accord Globe Newspaper Co. v. Beacon Hill Archit. Comm'n,* 100 F.3d 175, 187 (1st Cir.1996) ("[T]here is abundant authority for the proposition that aesthetic interests constitute a significant government interest justifying content neutral, narrowly tailored regulations of a public forum that

leave open ample alternative channels [of communication]."). There can be no question, therefore, that protection of the unique attributes of the Lexington Green is a sufficiently substantial interest to support the challenged regulations.[8]

Additionally, I find the regulations in question narrowly-tailored to serve the interest of protecting the Green. The regulations permit displays on the Green in connection with special events, as long as the displays are attended and are not left in place for longer than eight hours. Aside from tinkering with the eight-hour time limit, it is difficult to imagine a narrower set of regulations that could effectively achieve the Selectmen's goal of preserving the Green's historic character and preventing a clutter of unattended displays. *Cf. D.H.L Associates,* 199 F.3d at 59 ("A content-neutral time, place, and manner restriction is narrowly tailored if it 'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" (citing *Ward,* 491 U.S. at 799, 109 S.Ct. 2746 (internal citations omitted))).

Indeed, the Supreme Court has specifically suggested "a ban on all unattended displays" as an example of a potential, "reasonable, content-neutral time, place, and manner restriction[ ]." *Capitol Square Review and Advisory Board v. Pinette,* 515 U.S. 753, 761, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). Here, the Lexington Board of Selectmen simply followed that suggestion.

### b. *The regulations allow for reasonable alternative avenues of communication*

The final element of my analysis of the challenged Lexington regulations relates to the alternative channels of communica-

---

8. The argument that protection of aesthetics constitutes a substantial government interest is only strengthened in this case by the Green's status as a National Historic Landmark. *E.g. Globe Newspaper Co.,* 100 F.3d at 187 ("[I]t would not be unreasonable to [ac-

cord the Beacon Hill District a greater than average interest in aesthetics] given ... the District's significance to both Massachusetts and the nation as a whole, as evidenced by its designation as a National Historic Landmark.").

tion that remain open to the plaintiffs to promulgate their message. First, it must be noted that the regulations do not prevent the plaintiffs from staging short-lived Christian events on the Green, such as worship services, prayer vigils, or even demonstrations protesting the absence of the crèche.[9] In addition, plaintiffs could apply for a permit to erect the crèche for the duration of any such event. Finally, defendants indicate that there are two churches bordering the Green, at least one of which has offered to allow plaintiffs to display the crèche on its lawn.[10] These alternative channels of communication are more than sufficient to allow the plaintiffs to express their religious message.

### III. *CONCLUSION*

As discussed above, plaintiffs are unlikely to succeed on the merits of their Complaint, as I find the challenged regulations to be a permissible, content-neutral, time, place, and manner restriction on plaintiffs' speech. Therefore, because plaintiffs fail to satisfy the one factor "critical in determining the propriety of injunctive relief," *Lancor*, 760 F.2d at 362, plaintiffs' Motion for a Preliminary Injunction is hereby **DENIED.**

**SO ORDERED.**

---

9. In fact, the record indicates that plaintiffs have staged just such a demonstration several times in recent weeks, with the full permission of the Lexington Selectmen.

10. I recognize that this solution may not satisfy plaintiffs, as they indicate that placing the crèche on the historic Green uniquely conveys, for them, a message of religious freedom and tolerance. In light of the other avenues for religious expression *on the Green* that remain open to plaintiffs, however, I do not find this objection persuasive.