# United States Court of Appeals
## For the First Circuit

No. 01-2460

KNIGHTS OF COLUMBUS, COUNCIL #94, ET AL.,

Plaintiffs, Appellants,

v.

TOWN OF LEXINGTON ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Selya and Lipez, Circuit Judges,

and Singal,* District Judge.

Chester Darling, with whom Robert Roughsedge and Michael Williams were on brief, for appellants.
Jordana Glasgow, with whom Daryl Lapp and Palmer & Dodge, LLP were on brief, for appellees.

November 29, 2001

**SELYA, <u>Circuit Judge</u>.** This appeal requires us to decide whether the Town of Lexington, Massachusetts (the Town) violated the First Amendment by adopting a regulation that bans unattended structures from the historic Battle Green. The plaintiffs allege that this regulation infringes their First Amendment rights and that the Town adopted it for an improper purpose, <u>viz.</u>, to exclude the annual religious display of a crèche from the Battle Green. They also allege that, in all events, the Town's selective application of the regulation following its adoption renders it constitutionally infirm.

The district court found these charges unpersuasive and granted summary judgment in the Town's favor. We affirm: the record shows beyond hope of contradiction that the ban on unattended structures is a content-neutral restriction on the time, place, and manner of speech, narrowly tailored to achieve a significant governmental interest and framed so as to allow access to ample alternative avenues of communication. By the same token, there is no violation of the Free Exercise Clause because the regulation is a neutral law of general applicability. Lastly, the plaintiffs' claims of selective enforcement fail due to evidentiary insufficiency; the regulation was only intended to apply to private parties, and

there is nothing in the record that shows preferential treatment in respect to any unattended structure erected by such a party.

## I.  BACKGROUND

The situs of this controversy is the historic Battle Green (the Green) — the very place where the first battle of the Revolutionary War occurred.  Seven of the eight minutemen killed during the battle are buried there, and the Minuteman Statue — located at the apex of the Green — memorializes the American colonists who fought in the Revolutionary War.  The Green is a registered historic landmark, owned and maintained by the Town.

The Town's governing legislative body is the Board of Selectmen (the Board).  The Board is entrusted with suzerainty over, and protection of, the Green.  In the exercise of that function, the Board from time to time promulgates rules governing the use of the Green.  Historically, these rules have allowed for a wide range of public uses, including recreational activities and activities involving the expression of political, religious, and other views.  The rules divide activities on the Green into three categories:  (1) allowed activities, (2) forbidden activities, and (3) activities for which a permit is required.  To illustrate, picnicking in small groups is allowed as a matter of right; commercial solicitation is prohibited

-4-

altogether; and rallies are allowed if a permit is first obtained (but otherwise are forbidden).

For most of the twentieth century, the crèche — a figurine representation of Christ's nativity in the stable at Bethlehem — appeared on the Green for roughly six weeks each year (in late November and December). For some thirty years, the Town had erected the crèche, disassembled it, and stored the components. In or around 1973, however, two fraternal organizations — the Knights of Columbus and the Masons — assumed responsibility for these tasks.

There is evidence that the display of the crèche long has been a source of friction within the Town, and that some residents complained bitterly about its presence on the Green. For the most part, however, the regulations, insofar as they pertained to the crèche at all, seem to have been honored more in the breach than in the observance. Despite the fact that the regulations have required a permit for a religious display of this type since at least 1982, no permit ever was sought or demanded prior to the erection of the crèche in any year before 1999.

Beginning in the fall of 1998, the issue was repeatedly discussed at the Board's meetings. A group consisting of clergy and citizens with various viewpoints was formed to study the

problem and suggest solutions.  This committee reported to the Board on September 27, 1999.  It unanimously concluded that "private citizens do have the right to have religious observances on the common land within guidelines established by the town," but suggested that a shortened display period might be a reasonable compromise.  For the 1999 season, the owners of the crèche, including the Knights of Columbus, agreed to a display period of three weeks.

Subsequent to the Board's decision to allow the three-week display, it began receiving requests to allow a wide range of other religious structures on the Green for comparable periods.  One group desired to place a sign near the crèche indicating some citizens' objections to its presence on public land.  Other applicants requested permission for a display honoring witchcraft at Halloween and for the erection of a pyramid to honor the Egyptian Sun God Ra during the month of April.  Yet another resident inquired about the possibility of erecting a Sukkah, an open hut-like structure, to commemorate the Jewish harvest festival of Sukkoth.

The minutes of the Board's meetings reveal a keen awareness that if it continued to allow a display of the crèche, many of these competing applications would have to be granted. The Board thus believed that it was on the horns of a dilemma:

it could not constitutionally pick and choose among competing applications, but granting them all likely would compromise the aesthetic and historic elements of the Green. After seeking legal advice, the Board modified the rules governing use of the Green in several ways. First, it limited permit eligibility for public expressions on the Green to active events of less than eight hours in duration. Second, it restricted displays of a ceremonial nature to those "in connection with special events and limited in duration to the period required for such events." Third, it added an explicit prohibition against "placement on the Green of any unattended structure." For ease in reference, we annex a copy of the regulation, as amended, as an appendix to this opinion.

On October 19, 2000, the Knights of Columbus and the organization's grand knight, Michael O'Sullivan (collectively, the Knights), applied for a permit to erect the crèche on the Green. The application was constructively denied, although the Board intimated that a one-day event that included the crèche would be approved.[1]

Dismayed by the new regulation and the concomitant ouster of the crèche, the Knights sued. Although they claimed

---

[1]In point of fact, a Town resident was granted a permit to hold a "live" nativity scene and service on the Green on December 23, 2000.

abridgement of their free speech and free exercise rights, the district court refused to grant a preliminary injunction. Knights of Columbus v. Town of Lexington, 124 F. Supp. 2d 119 (D. Mass. 2000). We summarily affirmed that denial in an unpublished order.

In subsequent proceedings, the Knights attempted to show arbitrariness in the enforcement of the new regulation. They introduced evidence tending to prove that bleachers and a platform truck were left unattended on the Green for several days prior to a Patriots' Day celebration, and that an unattended podium was allowed to remain overnight around Memorial Day.

In due course, the district court granted summary judgment for the defendants (the Town and various Town hierarchs). We expedited the Knights' ensuing appeal in an effort to resolve the matter in advance of the Christmas season.

## II.  STANDARD OF REVIEW

We review a grant of summary judgment de novo, examining the record in the light most favorable to the nonmovant and indulging all reasonable inferences in that party's favor. Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000). We will uphold the grant of summary judgment only when there is no genuine issue of material fact and the

-8-

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Here, the relevant facts are largely undisputed, so our analysis focuses on the legal question of whether either the new regulation or its application offend the First Amendment.

## III. THE FREE SPEECH CLAIM

The Free Speech Clause of the United States Constitution lies at the heart of the Knights' appeal. We organize our discussion of this claim in segments.

### A. The Legal Framework.

The Free Speech Clause provides, in terms, that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. Amend. I. Under the aegis of the Fourteenth Amendment, this prohibition applies equally to states and their political subdivisions. See Cantwell v. Conn., 310 U.S. 296, 303 (1940). Despite the uncompromising language in which this proscription is couched, it is not absolute.

The Supreme Court has articulated a framework for determining whether a particular regulation impermissibly infringes upon free speech rights. That framework dictates the level of judicial scrutiny that is due — and that choice, in turn, informs the nature of the restrictions on free speech that

may be permissible in a public forum.  McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001).

The triage works this way.  The bedrock rule is that government may not prohibit all communicative activity in a public forum.  Perry Educ. Ass'n v. Perry Local Educ. Ass'n, 460 U.S. 37, 46 (1983).  Content-based prohibitions may endure — but only if they are justified by compelling state interests. Capitol Sq. Rev. & Advisory Bd. v. Pinette, 515 U.S. 753, 761 (1995).  Accordingly, such prohibitions engender strict judicial scrutiny.  See id.  Content-neutral restrictions pose less of a threat to freedom of expression.  Consequently, content-neutral restrictions on the time, place, and manner of speech trigger an intermediate type of scrutiny such that they will be upheld as long as they are "narrowly tailored to serve a significant governmental interest, and allow for reasonable alternative channels of communication."  Globe Newspaper Co. v. Beacon Hill Arch'l Comm'n, 100 F.3d 175, 186 (1st Cir. 1996).

Here, the Town's limitation of free speech on the Green is not absolute:  the new regulation merely prohibits one manner of expression (unattended structures) in a particular place (the Green) at certain times (when unconnected with an event).  Since the Town does not deny that the Knights have a free speech interest in exhibiting the crèche or that the Green is a public

-10-

forum, the salient question is whether the restriction is content-based or content-neutral. It is to that question that we now turn.

### B. Content-Based or Content-Neutral?

To ascertain whether a regulation is content-based, an inquiring court must determine whether it regulates speech because of disagreement with the particular message that the speech conveys. Id. at 183. The Knights concede, as they must, that the language of the regulation is facially neutral. The ban on unattended structures is comprehensive; it does not discriminate among types of unattended structures, and certainly does not single out the crèche. Thus, the Knights' argument boils down to a plaint that the legislative history demonstrates that the regulation's primary purpose is to prevent display of the crèche.[2]

In making this argument, the Knights rely heavily on a "free exercise" case, Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993). There, the Supreme Court ruled that a municipal ordinance prohibiting cruelty to animals

---

[2]The Town, citing United States v. O'Brien, 391 U.S. 367, 383-84 (1968), argues that we should not inquire into legislative purpose when a statute is content-neutral on its face. Here, however, both the text of the statute and the legislative history point toward neutrality, so we need not and do not decide whether such an inquiry is constitutionally required.

was unconstitutional because it was targeted at preventing the sacrificial rites practiced by adherents of the Santeria religion. Id. at 547. But Hialeah is readily distinguishable because the ordinance at issue there was riddled with exceptions that effectively made it applicable only to Santeria worshipers. See id. at 535. Thus, the ordinance — unlike the regulation at issue here — was not content-neutral in its operation. See id. For present purposes, the most that Hialeah teaches is that a court may have to look beyond the bare language of a regulation to determine whether its justification is content-neutral. See, e.g., Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) ("[G]overnment regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech."); D.H.L. Assocs. v. O'Gorman, 199 F.3d 50, 57 (1st Cir. 1999) (same).

In the instant case, there is nothing in the record that evinces a content-based animus against the crèche. On the contrary, the Board proposed the new regulation only after requests for permits for alternative religious displays began to sprout. Mindful of the strictures of the Establishment Clause, the Board reasonably assumed that it must treat all applications for religious displays alike, regardless of the message conveyed. Fearing a flood of applications and a corresponding

cluttering of the Green, the Board devised a regulation prohibiting <u>all</u> unattended structures.  This is a far cry from an invidious singling-out of the crèche.[3]

The only inference that the record permits is that the new regulation was conceived out of a desire to treat all religious expression even-handedly.  If the Knights feel that the burden of the regulation falls most heavily on them, it is perhaps because they are now held to the same standard as all other similarly situated applicants.  While the adjustment may not be an easy one, the outcome is inescapably content-neutral.

## C. <u>Significant Governmental Interest/Narrow Tailoring</u>.

Having determined that the regulation is content-neutral, we now apply intermediate scrutiny to ascertain whether it is narrowly tailored to achieve a significant governmental interest.  <u>McGuire</u>, 260 F.3d at 43.

The Town asserts that its interest in preserving the historical and aesthetic qualities of the Green amply justifies the restriction.  This is a theoretically sound position.  After all, in <u>Globe Newspaper</u>, we upheld, against a free speech challenge, a ban on news racks in a historic Boston

---

[3]The Town's longstanding practice of permitting the crèche to be displayed on the Green without a permit helps, rather than hinders, the Town's argument.  That practice shows a receptivity to the display and, contrary to the Knights' importunings, creates no entitlement to preferential treatment in the future.

neighborhood.  100 F.3d at 195.  We recognized there that aesthetic preservation may warrant a content-neutral restriction on speech in a public forum.  Id. at 187.  As was true in Globe Newspaper, the Town's interest in aesthetic preservation qualifies as a significant one.  Moreover, that interest is enhanced here by the site's designation as a national historic landmark.

In an attempt to blunt the force of this conclusion, the Knights argue that the regulation is not narrowly tailored to the achievement of this aesthetic rationale.  They make three points:  first, that it is not only unattended structures that produce clutter; second, that the Town should have pursued alternatives less restrictive than a total ban; and third, that the crèche is aesthetically pleasing.  The first two parts of this argument are plainly misguided.  The narrow tailoring requirement "does not mandate a least restrictive means analysis."  Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 744 (1st Cir. 1995).  Thus, the Town was "[not] required to implement or experiment with other alternatives before finally choosing the total ban."  Globe Newspaper, 100 F.3d at 189 n.15. The "narrow tailoring" requirement is satisfied as long as the particular "regulation promotes a substantial government

-14-

interest that would be achieved less effectively absent the regulation." Nat'l Amusements, 43 F.3d at 744.

Here, moreover, the regulation appears entirely logical when one recalls that it was adopted amid a concatenation of Establishment Clause concerns. See Good News Club v. Milford Cent. Sch., 121 S. Ct. 2093, 2103 (2001) (stating that avoiding an Establishment Clause violation may be a compelling state interest justifying even content-based restrictions on speech). The Town legitimately could conclude that unattended displays were more likely to present Establishment Clause issues than attended ones because, for instance, a reasonable observer might be confused as to the source of the message.[4] Cf. Capitol Sq., 515 U.S. at 778-79 (O'Connor, J., concurring). This is significant because the context of a religious display is crucial in determining its constitutionality. Compare County of Allegheny v. ACLU, 492 U.S. 573, 621 (1989) (forbidding display of a crèche in a county courthouse), with Lynch v. Donnelly, 465

_____

[4]Although the plurality opinion in Capitol Square proposed a per se rule to the effect that the government may not violate the Establishment Clause by providing a forum for private religious expression, see Capitol Sq., 515 U.S. at 770, a majority of the Justices rejected this limited abandonment of the endorsement analysis. See id. at 787 (Souter, J., with whom O'Connor and Breyer, JJ., joined, concurring); id. at 799 (Stevens, J., dissenting); id. at 817-18 (Ginsburg, J., dissenting).

U.S. 668, 685 (1984) (permitting inclusion of a crèche in a municipality's outdoor holiday display).

We note, too, that the Supreme Court has explicitly indicated that a total ban on unattended structures in a public forum would pass constitutional muster. In Capitol Square, a majority of the Justices (the plurality, plus Justices Souter and Stevens) specifically agreed that "[the state] could ban all unattended private displays" in a public forum. Id. at 783 (Souter, J., concurring); accord id. at 761 (plurality opinion); id. at 803 (Stevens, J., dissenting). Various decisions of the courts of appeals are to like effect. E.g., Am. Jewish Cong. v. City of Beverly Hills, 90 F.3d 379, 384 (9th Cir. 1996) ("The city constitutionally could ban all unattended private displays in its parks."); Congregation Lubavitch v. City of Cincinnati, 923 F.2d 458, 460 (6th Cir. 1991) (similar); Lubavitch Chabad House, Inc. v. City of Chicago, 917 F.2d 341, 347 (7th Cir. 1990) (similar). Finding no reason why the case before us demands a different outcome, we hold that the total ban on unattended structures is both content-neutral and narrowly tailored to achieve a substantial governmental interest. It is, therefore, constitutionally permissible.

As to the Knights' claim that the crèche is aesthetically pleasing, the Establishment Clause makes clear

-16-

that the Town was bound to consider a range of potential religious displays when it envisioned the future of the Green. Thus, the aesthetics of the crèche, in the abstract, are irrelevant. The Town rationally could have decided that some of the requested displays, or the sheer number of potential displays, would be inconsistent with the aesthetic quality of the Green. Even if the crèche were more beautiful than all the others — a matter on which we take no view — the Town was not at liberty to allow the crèche while at the same time prohibiting other religious displays.

### D. **Alternative Avenues of Communication**.

As a final matter, the regulation does not unduly restrict the Knights' free speech rights because they have adequate alternative avenues of communication available to them. See McGuire, 260 F.3d at 43; Globe Newspaper, 100 F.3d at 186. The Knights remain free to display the crèche, either during the course of an event on the Green or at any time on nearby private property.[5] To be sure, the Knights argue that these are not adequate alternatives — an event would be too transitory and placing the crèche on private property would not convey the same message. But the message that they suggest is suppressed is

---

[5]The record shows that one of the two churches facing the Green is willing to have the crèche displayed on its front lawn for the customary six-week interval.

-17-

that the crèche belongs "at the center of public life in the Town of Lexington." This resupinate reasoning turns the constitutional standard upside-down. Although the Constitution protects private expressions of beliefs, it does not authorize — and sometimes even forbids — citizens' attempts to invoke public backing of their beliefs. The Knights have no constitutional right to communicate a message of public support for the crèche.

It is also notable that the crèche is not completely banned from the Green. Like any other ceremonial display, it may appear on the Green in conjunction with an active event for up to eight hours. The Knights have not explained why such a display is impractical, instead stating that the Town has no right to dictate to them how they must express their private beliefs. Yet the Town has issued no general ukase regarding private religious observances; only religious displays on a single strip of public land are affected. In a forum of this kind, it has long been established that government may impose reasonable restrictions on the manner of speech. See, e.g., Capitol Sq., 515 U.S. at 761. In adopting the regulation, the Town has done no more than exercise its right to manage its property in the manner it deems desirable without crossing the constitutional line.

-18-

## E.    Consistency in Application.

The Knights' next argument is that the amended regulation has been applied so inconsistently that it gives municipal officials unfettered discretion (and, thus, violates the rule announced in Cox v. Louisiana, 379 U.S. 536 (1965)). In Cox, the Court struck down a municipal ordinance prohibiting street parades and meetings on the ground that the ordinance effectively gave local officials unbridled discretion to permit some demonstrations and disallow others. Id. at 557. The case stands for the proposition that a neutral ordinance may violate the First Amendment if it invites uneven application.

To demonstrate that the regulation here at issue has been enforced selectively, the Knights presented evidence of other unattended structures that have been seen on the Green since the new regulation was adopted, e.g., bleachers and a platform truck were left on the Green prior to a Patriots' Day celebration, and a podium appeared on the Green some days prior to a Memorial Day event.

The most obvious flaw in this construct is the lack of any evidence that these structures were erected by private parties. This gap is critical because the regulation was never intended to apply to actions by the Town itself. In fact, the text of the regulation, as adopted by the Board, prohibits

-19-

"[p]lacement on the Battle Green of any unattended structure <u>by</u> <u>any private party</u>" (emphasis supplied).  Even though these last four words later were omitted from the printed regulation through an apparent clerical error, it is reasonable to interpret the regulation as applying only to private parties. In fact, the entire subsection in which the regulation resides (quoted in the Appendix) is most plausibly read as applying only to private conduct.  For example, we do not believe that the provision prohibiting "removal[] or disturbance of any . . . monument, statue, marker, animal or plant" reasonably could be construed to prevent regular maintenance, repair, replacement, or landscaping done by the Town.  Similarly, the prohibition on the use of firearms is most sensibly understood as not encompassing police officers acting in their official capacity. Because the Town is exempt from the ban on unattended structures on the Green, the Knights' claim of selective enforcement fails for evidentiary insufficiency.

**IV.  THE FREE EXERCISE CLAIM**

The Free Exercise Clause also is made applicable to the states (and, therefore, to municipalities) through the Fourteenth Amendment.  <u>See</u> <u>Cantwell</u>, 310 U.S. at 303.  It provides that "Congress shall make no law . . . prohibiting the free exercise [of religion] . . . ."  U.S. Const. Amend. I.  In

-20-

interpreting this language, the Supreme Court has recognized that the exercise of religion sometimes may involve "performance (or abstention from) physical acts," and that the government may violate the right to free exercise if it seeks "to ban such acts or abstentions only when they are engaged in for religious reasons." Employment Div., Dep't of Human Res. v. Smith, 494 U.S. 872, 877 (1990). Even so, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." Hialeah, 508 U.S. at 531.

The Knights' current reliance on this doctrine is misplaced. As we already have determined, see supra Part III(B), the ban on unattended structures is content-neutral in every way. For the reasons elaborated in our previous discussion, we are bound to conclude that the regulation does not discriminate against a particular religion or religious practice. See Hennessy v. City of Melrose, 194 F.3d 237, 244 n.1 (1st Cir. 1999) (explaining that private beliefs do not excuse a party from complying with a law of general applicability). Hence, the Knights cannot rewardingly invoke the Free Exercise Clause in their attack on the regulation.

**V. CONCLUSION**

-21-

We do not live in a utopian world, and the myriad guarantees that the Constitution provides sometimes can operate in tension with one another. So it is here: the Establishment Clause pulls in the direction of separating church and state, while the Free Exercise Clause pushes in the direction of permitting the unfettered expression of religious doctrine. In our view, the Town has reconciled these competing centrifugal and centripetal forces in a constitutionally acceptable manner, holding the delicate balance steady and true. Admittedly, its solution — the banning of all unattended structures from the village green — inhibits some speech, but the solution is content-neutral, narrowly tailored to suppress no more speech than necessary, and leaves open ample alternative avenues of communication. No more is exigible to withstand the intermediate level of scrutiny that the First Amendment imposes here.

We need go no further. We hold that the Town's ban on unattended structures on the Green is a permissible "time, place, and manner" restriction that operates without reference to the content of speech, and that the aesthetic preservation of so historic a landmark furnishes an appropriate basis for imposing this narrowly tailored restriction in a public forum. Because the challenged regulation leaves open many other means

of communication for religious speech and there is no competent evidence of selective enforcement, we reject the Knights' free speech claim.  On much the same analysis, we likewise reject the Knights' free exercise claim.  Consequently, we hold that the lower court did not err in granting summary judgment for the defendants.

**Affirmed**.

## **Appendix**

RULES AND SPECIFICATIONS REGULATING THE USE OF THE BATTLE GREEN

The following rules and regulations have been adopted in accordance with the General By-Law, Article XXV, Section 225, "Protection of the Battle Green", as amended. If these regulations or portions thereof, conflict with the By-Law, the By-Law shall take precedence.

## 1. DEFINITIONS

a.  "Audio device" means any radio, television set, musical instrument, or other device that produces noise.
b.  "Disorderly conduct" means any action intended to cause inconvenience, annoyance, or alarm, or which recklessly creates a risk thereof; fighting, threatening or violent behavior; unreasonable noise; abusive language directed toward any person present; wrestling in vicinity of others; throwing of breakable objects; throwing of stones; or spitting.
c.  "Powerless flight" means any device used to carry persons or objects through the air; for example, sailplanes, gliders, balloons, body kites, hand gliders.
d.  "Public use limit" means the maximum number of people or the amount, size, or type of equipment permitted on the Battle Green at one time, as established by the Board of Selectmen.
c.  "Special event" means demonstrating, picketing, speechmaking, marching, holding of vigils, and all other similar forms of conduct which involve the active communication or expression of opinions or grievances, engaged in by one or more persons, the conduct of which has the effect, intent or propensity to draw a crowd or onlookers.
f.  "Wet turf" shall mean any natural condition that would make the Green vulnerable to excessive damage by heavy wear or use; for example, heavy rains, reseeding, drought conditions.
g.  "Non-permit activities" shall mean activities that may be engaged in without a permit issued by the Board of Selectmen.

## 2. NON-PERMIT ACTIVITIES

Subject to the restrictions in these rules and regulations, permits shall not be required for:

a.  Conduct that does not cause public inconvenience, annoyance, or alarm.
b.  Picnicking restricted to benches only and to groups of no more than five people.
    Picnicking on the Green by bus tours or similar groups is forbidden.
c.  The gathering of groups on the Battle Green for the sole purpose of exploring and enjoying its history, and which do not remain for more than four hours.
d.  Playing of audio devices at a reasonable volume.

e. The playing of games that do not:
   i. exceed three players; or
   ii. damage the Green's physical condition; or
   iii. disturb or inconvenience those visiting the Green for historic interest; or
   iv. constitute any type of disorderly conduct.

## 3. PERMIT REQUIRED ACTIVITIES

a. The purpose for requiring permits for certain activities is to promote the use of the Battle Green in a manner consistent with its nature and history; to protect the Battle Green from harm; to ensure adequate notice of the event so that arrangements can be made to protect the public health and safety and to minimize interference with the event by the public.

b. Permits are required for any of the following activities, singly or in combination:
   i. Any group activity reasonably likely to exceed the public use limit established by the Board of Selectmen.
   ii. Special events, public meetings, assemblies, gatherings, demonstrations, parades, and other active public expressions of interest, not to exceed eight hours in duration.
   iii. Pageants, reenactments, regattas, entertainments, or other as public spectator attractions.
   iv. Displays of a ceremonial nature in connection with special events and limited in duration to the period required for such events.
   v. Use of public address system, electrical lighting, or other electrical devices.
   vi. Distribution of printed matter other than commercial advertising.
   vii. Possession of firearms if unloaded or packed in such a way as to prevent their use.
   viii. Possession of explosives, as long as individuals or groups conform to Federal, State, and local laws governing such possession.
   ix. Use or possession of fireworks or firecrackers.

## 4. IMPERMISSIBLE ACTIVITIES

The following activities are strictly prohibited:

a. Any group activity that exceeds the public use limit established by the Board of Selectmen for the Battle Green.
b. Possession, destruction, injury, defacement, removal, or disturbance of any building, sign, equipment, monument, statue, marker, animal or plant.
c. Distribution or display of commercial advertising; or soliciting of business; or any other commercial transactions.
d. Remaining on the Battle Green for more than four hours.
e. Abandonment of any vehicle or personal property.
f. Unreasonably loud operation of audio devices.

g.  Delivery of any person or thing by parachute or helicopter.
h.  Powerless flight activities.
i.  Begging.
j.  Disorderly conduct.
k.  Use of firearms.
l.  Use of metal detecting device for personal use.
m.  Gambling of any form or operation of gambling devices.
n.  Picnicking except as provided in 2b.
o.  Use of roller skates and skateboards.
p.  Placement of the Battle Green of any unattended structure.

## 5. PERMIT PROCESS

a.  Application for permits to conduct activities on the Battle Green, specified in 3, above, shall be filed no later than two weeks prior to the requested date.  Late and/or incomplete applications will be considered at the discretion of the Board of Selectmen.
b.  Permit applications shall include the following information:
    i.   Name and phone number of a responsible contact.
    ii.  Date and time of event.
    iii. Nature of event.
    iv.  Expected number of participants, spectators, and vehicles.
    v.   Duration of event.
    vi.  Statement of equipment and facilities to be used.
    vii. Section of the Green desired.
c.  The responsible party is to keep the permit, which must be available for inspection upon request.  The responsible party may be required by the Board of Selectmen, as a condition of issuing the permit, to pay for detail police officers if the Board determines that such officers are necessary for public safety.
d.  Permits are issued upon express condition the Green is to be left in an orderly fashion.
e.  Permits are non-transferable; and are only valid for date and time specified.
f.  A permit shall be revoked if a sanctioned event engages in impermissible activities and may be revoked if the permit group engaged in activities that are not within the specification of the permit.
g.  The Board of Selectmen may alter a request by setting reasonable conditions and restrictions as to duration and area occupied, as are necessary for protection of the area and public use thereof.
h.  Wet turf conditions may supersede the use of a granted permit at the discretion of the Board of Selectmen to protect the condition of the Battle Green.

## 6. GROUNDS FOR DENIAL OF PERMIT REQUEST

a.  Prior applications for permit for conflicting schedule has been made or will be granted.
b.  Event presents a clear and present danger to public health or safety.

c.   Event is of such nature or duration that it cannot reasonably be accommodated in the area applied for; or the expected number of participants exceeds the public use limit.
d.   Event will, in the opinion of the Board of Selectmen, cause unacceptable interference with use of the Green by the general public.
e.   Event is requested for a date that conflicts with official celebrations of the Town.
f.   Event is more appropriately held at other available Town facilities, such as recreational facilities.

Approved by the Board of Selectmen July 15, 1986
Amended July 24, 2000