903 F.2d 914
 Lloyd CAREW-REID, Kathleen Mock, Lawrence Kobak, a/k/a
"Sailorman Jack," James Humphries, Carleton Ferguson
Hypolite, Sloboden Vucicevic, Peter Barkman, Antonio Gomes,
and Subway Troubadors Against Repression, Plaintiffs-Appellees,
v.
METROPOLITAN TRANSPORTATION AUTHORITY, Metro-North Commuter
Railroad Company, New York City Transit Authority, and
Robert R. Kiley and David L. Gunn, in their individual and
official capacities, Defendants-Appellants.
 No. 1172, Docket 90-7143.
 United States Court of Appeals,
Second Circuit.
 Argued March 7, 1990.
Decided May 18, 1990.
 
 Susan E. Weiner, Deputy Gen. Counsel, Metropolitan Transp. Authority, New York City, for appellants.
 David B. Goldstein, New York City (Eric M. Lieberman, Edward Copeland, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, National Emergency Civil Liberties Committee, New York City, of counsel), for appellees.
 Before TIMBERS, MESKILL and ALTIMARI, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This is an appeal from an order of the United States District Court for the Southern District of New York, Stanton, J., granting plaintiffs-appellees' motion for a preliminary injunction restraining defendants-appellants from enforcing a ban against the use of amplifiers by musicians on New York City subway platforms. The question presented on appeal is whether the amplifier ban constitutes a reasonable time, place or manner restriction within the meaning of the First Amendment.
 
 BACKGROUND
 
 2
 Plaintiffs-appellees are musicians who perform in the New York City subway system and an organization whose purpose is to promote the rights of subway musicians. Defendant-appellant New York City Transit Authority (NYCTA) is a public benefit corporation created by N.Y.Pub.Auth.Law Sec. 1201 (McKinney 1982 & Supp.1990). Its statutory purpose is to operate the subway system "for the convenience and safety of the public." Id. Sec. 1202. Defendant-appellant Metropolitan Transportation Authority (MTA) is a public benefit corporation created to operate the commuter transportation system in New York City and the surrounding counties. Id. Secs. 1260-1279-b.
 
 
 3
 In October 1987, the NYCTA issued experimental guidelines that permitted a wide range of expressive activities in the subway system, including public speaking, distribution of written materials, solicitation for charitable, religious and political causes, and artistic performances. The experimental guidelines, however, expressly prohibited the playing of any instrument or the use of an amplifier that created "excessive" noise. Moreover, a permit was required before an amplifier could be used, and the permit placed a ninety decibel limit on the use of the amplifier.
 
 
 4
 The experience with the experimental guidelines led the NYCTA to adopt amended rules for musical performances in the subway system. The amended rules banned entirely the use of amplifiers on subway platforms. N.Y.Comp.Code R. & Regul. tit. 21, Sec. 1050.6(c)(4) (1989). All other musical performances were restricted to a noise level not to exceed 85 decibels when measured from five feet away. Id. These changes were based on the NYCTA's surveys during the period that the experimental guidelines were in force, indicating that amplified music "routinely" exceeded the 85 decibel level. Moreover, the NYCTA pointed to the potential safety hazards to subway riders and maintenance crews as well as the interference with the duties of transit police caused by music above 85 decibels. Finally, it asserted that enforcement of the 85 decibel limit would be made more difficult without the amplifier ban.
 
 
 5
 The amplifier ban went into effect on October 25, 1989. Appellees brought suit in the district court and sought a preliminary injunction restraining the enforcement of the amplifier ban. They claimed that the ban impaired their ability to perform their music and that amplified music did not exceed the 85 decibel limit any more than unamplified music. In lieu of an evidentiary hearing, the parties submitted affidavits in support of their respective positions. The district court granted a preliminary injunction, concluding that the amplifier ban violated appellees' rights under the First Amendment. Appellees also challenged that portion of the new rules that prohibits unauthorized commercial activity in the subway system insofar as it restricted their ability to sell audio tapes of their music. The district court denied this aspect of their motion for a preliminary injunction, and no appeal has been taken therefrom.
 
 DISCUSSION
 
 6
 "Music is one of the oldest forms of human expression." Ward v. Rock Against Racism, --- U.S. ----, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989). As appellants concede, music, as a form of expression, is protected by the First Amendment. Id.; Schad v. Borough of Mount Ephraim, 452 U.S. 61, 65, 101 S.Ct. 2176, 2180, 68 L.Ed.2d 671 (1981); Calash v. City of Bridgeport, 788 F.2d 80, 82 (2d Cir.1986). This is only the beginning of our inquiry, however. The Supreme Court has repeatedly held that "government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' " Rock Against Racism, 109 S.Ct. at 2753 (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)); accord Frisby v. Schultz, 487 U.S. 474, 481-82, 108 S.Ct. 2495, 2500-01, 101 L.Ed.2d 420 (1988); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).
 
 
 7
 Because this appeal is from a district court order entering a preliminary injunction, our scope of review is circumscribed. Our review is limited to whether the district court abused its discretion. Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32, 95 S.Ct. 2561, 2467-68, 45 L.Ed.2d 648 (1975); Stormy Clime, Ltd. v. ProGroup, Inc., 809 F.2d 971, 973-74 (2d Cir.1987).
 
 A. Content Neutrality
 
 8
 A valid time, place or manner restriction cannot find its justification in the suppression of the content of the expression that it regulates. Community for Creative Non-Violence, 468 U.S. at 295, 104 S.Ct. at 3070; Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 648, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981). In other words, the "evil" that the regulation seeks to eliminate cannot be the regulated expression's content or message. Yet, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Rock Against Racism, 109 S.Ct. at 2754; see City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47-49, 106 S.Ct. 925, 928-30, 89 L.Ed.2d 29 (1986).
 
 
 9
 Appellees argue and the district court found that amplified music is not merely music that is made louder by an electronic device; rather, it is a different kind of music. As the affidavits submitted to the district court by the individual appellees reflect, some instruments cannot be played without an amplifier. Moreover, the sound of vocals or of an acoustic instrument can be transformed through the use of an amplification device into a unique musical form. Thus, the amplifier ban does not just exclude music whose volume is electronically increased; instead, it eliminates from the subway platforms a separate musical medium.
 
 
 10
 The object of the amplifier ban, nevertheless, is the elimination of excessive noise on subway platforms, not the suppression of the kind of "electrified" music that appellees play. Therefore, even though the regulation is based on a particular medium of expression and in fact is a complete ban on the use of that medium, it remains neutral with regard to the expression's content. See City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804-05, 104 S.Ct. 2118, 2128-29, 80 L.Ed.2d 772 (1984) (complete prohibition on posting of signs on public property).
 
 B. Narrow Tailoring
 
 11
 In addition to being content-neutral, a time, place or manner restriction must be narrowly tailored to serve a significant governmental interest. The elimination of excessive noise is a substantial and laudable goal. Rock Against Racism, 109 S.Ct. at 2756; Grayned v. City of Rockford, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972); Kovacs v. Cooper, 336 U.S. 77, 87-88, 69 S.Ct. 448, 453-54, 93 L.Ed. 513 (1949) (plurality opinion). In this case, the interest in eradicating excessive noise is bolstered by the serious public safety concerns posed by the noise to both the riders and employees of the subway system. In particular, appellants' affidavits state that amplified music is usually so loud that it interferes with police communications, the public address system on the subway platforms and the work of track crews. Excessively loud noise, according to appellants, can drown out train whistles, putting track workers at risk, and can prevent passengers from hearing routine and emergency announcements.
 
 
 12
 Although appellees do not dispute that the interest in eliminating excessive noise from the subway platforms is a significant one, they do argue that, because there is no necessary connection between amplified music and loud music, the amplifier ban suppresses more speech than is necessary to achieve the interest of noise reduction. The district court accepted this position. Relying on appellants' failure to show that every musician who uses an amplifier exceeds the 85 decibel limit, the district judge determined that excessive noise is only a possible byproduct of the use of amplifiers by musicians. Furthermore, he concluded that the goal of noise reduction could be achieved by enforcing the 85 decibel limit through the use of decibel meters.
 
 
 13
 "[T]he requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " Rock Against Racism, 109 S.Ct. at 2758 (quoting United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)). Furthermore, if the scope of the regulation is not substantially broader than required to secure the governmental interest, the regulation is not invalid simply because a court, second-guessing the decisions of the governmental body, discerns some less-restrictive alternative to the regulation. Id.; Albertini, 472 U.S. at 689, 105 S.Ct. at 2906; Community for Creative Non-Violence, 468 U.S. at 299, 104 S.Ct. at 3071. The "essence" of narrow tailoring is a "focus[ ] on the source of the evils" that the regulation seeks to eliminate and the elimination of those evils "without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." Rock Against Racism, 109 S.Ct. at 2758 n. 7.
 
 
 14
 The district court erred in two important respects. First, the district court improperly relied on the perceived availability of a less-restrictive alternative to the amplifier ban--the use of decibel meters. Rock Against Racism makes clear that the less-restrictive alternative analysis has no part in the review of a time, place or manner regulation. 109 S.Ct. at 2757-58. The noise regulation requires that decibel measurements be taken at a distance of five feet from the music's source. The difficulties in making such measurements on a crowded subway platform with riders rushing on and off trains are apparent, as indicated in the affidavit of Richard Gollinge, a New York City Transit Police Captain. The district court dismissed the potential difficulties of using decibel meters as the sole means of enforcing the noise restrictions as nothing more than an inconvenience. However, "[t]he validity of [time, place or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests." Albertini, 472 U.S. at 689, 105 S.Ct. at 2906; see Community for Creative Non-Violence, 468 U.S. at 299, 104 S.Ct. at 3072. The district court's reliance on the less-restrictive alternative offered by decibel meters reflects little more than the court's rejection of appellants' determination of how best to enforce the noise limits.
 
 
 15
 Second, the district court imposed an excessively exacting standard in concluding that the amplifier ban is broader than necessary to achieve the goal of noise reduction. The court placed particular weight on appellants' failure to show that every musician using an amplifier exceeded 85 decibels. The requirement of narrow tailoring is not so demanding. See Rock Against Racism, 109 S.Ct. at 2758. Appellants submitted several affidavits from NYCTA officials stating that their experience under the experimental guidelines reflected that amplified music "routinely" and "usually" exceeded the noise regulation's limits. Appellees attempted to counter this showing with affidavits of their own indicating that they took decibel measurements of themselves and a small handful of other musicians in the subways and found that amplified musicians played below the 85 decibel limit. Appellees' anecdotal findings, however, do not necessarily contradict those of appellants; rather, they only show that it is possible for amplifiers to produce sound below the upper decibel limit. Although not overwhelming and at times somewhat conclusory, appellants' affidavits are entirely consistent with the nature of electronic amplifiers, which carry the potential for producing sound above the regulation's limits with as little effort as a simple twist of a knob.[1]
 
 
 16
 Along the same vein, the district court's conclusion that the amplifier ban was not narrowly tailored because it has a substantial effect on the quality of the appellees' performances is misdirected. In making this conclusion, the district judge relied on a statement made in Rock Against Racism, in which the Supreme Court suggested that "[i]f the city's regulatory scheme had a substantial deleterious effect on the ability of ... performers to achieve the quality of sound they desired," the regulation might sweep too broadly. 109 S.Ct. at 2759. That case presented a challenge to New York City's regulations governing concerts in a Central Park bandshell. The regulations required musical groups performing in the bandshell to use a sound system provided by the city and a sound technician selected by the city. Id. at 2750-51. The Court bolstered its conclusion that these requirements were narrowly tailored to the elimination of excessive noise because they did not impair the ability of musicians to control the quality or mix of their sound. If the regulations placed complete control over sound quality and mix in the hands of the city's technician, the Court indicated that the regulations might not qualify as a reasonable time, place or manner restriction. Id. at 2759.
 
 
 17
 The reason for this conclusion in Rock Against Racism demonstrates the distinction from the instant case. The city's sound technician did not need to control the sound quality or mix in order to control the noise level. Id. Depriving the musicians of control over sound quality and mix would therefore restrict a substantial quantity of expression without advancing the interest of noise reduction. By contrast, in the instant case the source of the "evil" is the medium of expression itself. Appellants have determined, after their experience under the experimental guidelines, that amplified music routinely produces excessive noise. The incidental effect of the amplifier ban, obviously, is that those musicians who previously used amplifiers on subway platforms will be forced to alter their performances or to perform elsewhere. Nevertheless, this restriction on the manner of their expression is justified because it is the manner itself that produces the evil that is the object of regulation, and, based on appellants' showing, the regulation would be less effective absent this restriction. The amplifier ban therefore meets the narrow tailoring requirement.
 
 C. Alternative Channels
 
 18
 The record reflects that ample alternative channels exist for appellees' expression. The amplifier ban applies only to subway platforms. Appellees counter that many of the subway mezzanines are restricted to musicians in the MTA's Music Under New York program and that inclement weather often precludes performing above ground. The First Amendment, however, does not guarantee appellees access to every or even the best channels or locations for their expression. See Taxpayers for Vincent, 466 U.S. at 812, 104 S.Ct. at 2132. Appellees can perform in some of the subway mezzanines and above ground and still reach similar, if not the same, audiences that they could perform for on the subway platforms.
 
 
 19
 Because we conclude that the amplifier ban is a reasonable time, place or manner regulation, we need not address the question whether the subway platforms constitute traditional, designated or limited public forums. See generally Perry Educ. Ass'n, 460 U.S. at 45, 103 S.Ct. at 954 (government may enforce reasonable time, place or manner regulations in public forums).
 
 CONCLUSION
 
 20
 On the basis of the record before us, we hold that the amplifier ban constitutes a reasonable time, place or manner restriction as a matter of law. The district court therefore abused its discretion in granting appellees' motion for a preliminary injunction. The order of the district court is accordingly reversed, and the matter is remanded for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 The author, who dissented in part in Young v. New York City Transit Authority, 903 F.2d 146 (2d Cir.1990), which involved a First Amendment challenge to the NYCTA's regulations prohibiting begging in the subway system, would distinguish this case from Young. In the author's view, the NYCTA in Young failed to put forward adequate evidence to support the assertion that all or most begging was likely to result in more pedestrian congestion and passenger harassment than soliciting by organized charities. Id. at 168 (Meskill, J., concurring in part and dissenting in part). Thus, the regulation in Young was not demonstrated to be narrowly tailored. By contrast, the record in the instant case supports the conclusion that the amplifier ban is not substantially broader than necessary to accomplish its ends