# United States Court of Appeals

## For the First Circuit

No. 01-2600

LAUREL CASEY and ASTERIX AND OBELIX, LLC,

Plaintiffs, Appellants,

v.

CITY OF NEWPORT, RHODE ISLAND

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,
and McAuliffe,[*] District Judge.

Thomas W. Kelly for Appellants.

Marc DeSisto for Appellee.

October 16, 2002

---

[*]Of the District of New Hampshire, sitting by designation.

**LIPEZ, Circuit Judge**.  This case requires us to assess the constitutionality of restrictions imposed by the City of Newport, Rhode Island (City), on the performance of music at Asterix and Obelix (A&O), a Newport restaurant/nightclub.  The district court rejected a First Amendment challenge to the restrictions mounted by A&O and Laurel Casey, a cabaret singer who performs at A&O, and entered summary judgment for the City on the ground that the restrictions were narrowly tailored to serve a significant governmental interest.  Concluding that the district court's narrow-tailoring decision lacks support in the record, we vacate the judgment and remand for further proceedings.

## I.

A&O is located at 599 Thames Street in Newport.  The property is zoned "limited business" and abuts a residential neighborhood.  In June of 1998 A&O was granted an entertainment license permitting musical performances, pursuant to Newport, R.I., Ordinances ch. 5.68 (Public Entertainment).  The word "None" was typed next to the word "Amplification" on the approved application.  On June 4, 1999, Casey performed at A&O with her voice amplified, accompanied by an amplified bass and an unamplified piano.  That evening A&O was cited for violating the City's noise ordinance.  Newport, R.I., Ordinances ch. 8.12 (Noise Abatement) (setting maximum decibel level of 75 for districts zoned "limited business").  Casey explained the events which gave rise to the

violation of the noise ordinance at a City Council hearing on June 9:

> Now, to tell you the truth, it was my fault last Friday that we went over the . . . Noise Ordinance. A person in the audience requested that I sing from an operetta and I began to sing a portion of Rinaldo. There are several high notes that go above high note C in R[i]naldo and it was those high notes apparently that shot us off the scale.

The complaint against A&O was subsequently dismissed. As far as the record reveals, A&O was not cited for violating the terms of its entertainment license.

On June 9, 1999, the City Council held a hearing on A&O's application for a renewed license that would permit amplification. Residents of the neighborhood voiced displeasure with the noise emanating from A&O during musical performances. The Council voted to renew A&O's entertainment license, but with the no-amplification restriction still in place, and with an added prohibition against singing (whether amplified or not).

On June 18, 1999, Casey filed a complaint against the City in federal district court seeking declaratory and injunctive relief and damages under 42 U.S.C. § 1983 on the ground that the no-singing and no-amplification restrictions violated her right to free expression under the First Amendment. On June 23, 1999, the Council removed the no-singing restriction, which it had imposed in the mistaken belief that A&O's previous license had included the

same restriction.[1]  The no-amplification restriction, however, remained in force.  The Council also required that A&O keep its doors and windows closed during musical performances.[2]  A First Amended Complaint was filed on July 9, 1999, adding A&O as a plaintiff.

On May 1, 2000, the Council again renewed A&O's entertainment license, this time with amplification of singing allowed, but amplification of musical instruments forbidden.  A Second Amended Complaint filed on July 31, 2000, added a count challenging the ban on amplification of instruments effective as of June 2000.  After the parties filed cross-motions for summary judgment, the district court granted summary judgment for the City on October 24, 2001, holding that the challenged restrictions were valid time, place, and manner regulations that did not infringe upon the plaintiffs' First Amendment rights.  Plaintiffs filed this timely appeal in which they ask us to vacate the judgment of the district court and order the entry of a judgment declaring that the City's license restrictions are unconstitutional, enjoining their enforcement, and leaving the question of damages for the district court on remand.

---

[1]  The Council had intended on June 9 simply to deny A&O's application to expand its previous license.  On June 23 the Council concluded that to permit singing would not constitute an expansion of the license, and therefore removed the no-singing restriction.

[2]  Appellants do not object to this requirement.

-4-

## II.

We review the district court's grant of summary judgment for the City de novo, examining the record in the light most favorable to Casey and A&O and drawing all reasonable inferences in their favor. We affirm the district court's decision only if "there is no genuine issue of material fact" and the City "is entitled to judgment as a matter of law." See Knights of Columbus, Council #94 v. Town of Lexington, 272 F.3d 25, 30 (1st Cir. 2001). Here we focus on the legal question of whether the challenged restrictions violate the First Amendment. See id.

"Music, as a form of expression and communication, is protected under the First Amendment." Ward v. Rock Against Racism, 491 U.S. 781, 790 (1989). Expression need not include words to qualify for First Amendment protection. The Supreme Court has said that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557, 569 (1995) (citation omitted). Thus it is not just Casey's verbal expression, but also the musical sound she and her band produce, that is protected under the First Amendment.

Nevertheless, "the government may impose reasonable restrictions on the time, place, or manner of protected speech," if those restrictions are (1) content neutral; (2) narrowly tailored to serve a significant governmental interest; and (3) leave open ample alternative channels of communication. Ward, 491 U.S. at 791. We have described our review under this standard as "intermediate scrutiny." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 736 (1st Cir. 1995). Intermediate scrutiny is "more demanding than the 'rational basis' standard that is often used to gauge the constitutionality of economic regulations," id., but less rigorous than strict scrutiny, where we inquire "whether a regulation 'is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.'" Id. (quoting Arkansas Writers' Project Inc. v. Ragland, 481 U.S. 221, 231 (1987)). If a regulation of speech is not narrowly tailored to serve a significant governmental interest, it cannot be deemed constitutional. See Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 668 (1994) (vacating district court decision that content-neutral regulation of speech was constitutional because facts in the record failed to establish that narrow-tailoring requirement was met). The burden of proof is on the City to demonstrate that its restrictions on speech are narrowly tailored. See Board of Trustees v. Fox, 492 U.S. 469, 480 (1989) ("[S]ince the State bears

the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require.") (citation omitted).

The district court held that the challenged restrictions were permissible under the Ward test.  Although chronologically the first restriction imposed on performers at A&O was the ban on singing, we think it makes more sense to begin our legal analysis with the no-amplification and no-amplification-of-instruments restrictions.  We deal with the no-singing restriction last.[3]

## A. No Amplification

### 1. Content Neutrality

The Supreme Court has said that "[t]he principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.  The government's purpose is the controlling consideration." Ward, 491 U.S. at 791 (citation omitted).  Thus a regulation that has a disparate effect on different styles of music may nevertheless be considered content neutral if the intent behind the regulation is unrelated to content.  The district court found that "[t]he [City's] clear objective in imposing the [no-

---

[3] Because plaintiffs are seeking damages, their challenges to restrictions that are no longer in effect (the no-singing and no-amplification restrictions) are not moot.  See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 478 n.1 (1989) (noting that expiration of ordinance does not moot controversy because plaintiffs may be entitled to damages if City's conduct pursuant to ordinance was unlawful).  As far as the record reveals, the no-amplification-of-instruments restriction remains in force.

amplification] restriction was to reduce noise . . . , a purpose unrelated to the content of the message [appellants] sought to convey."  There being no suggestion in the record that the no-amplification restriction was motivated by the content of Casey's performances, the restriction qualifies as content neutral.

## 2. Narrow Tailoring

On the question of narrow tailoring, the district court found that the no-amplification restriction in force between June of 1999 and June of 2000 (banning amplification of both singing and instruments) "serves defendants' articulated interest" in noise reduction, and that without the restriction, "the City would be unable to control effectively the volume of music, amplified or unamplified, emanating from [A&O]."  The court then declared that the no-amplification restriction "does not burden more speech than necessary," and that "plaintiffs could still convey their respective messages, but . . . without the aid of an amplifier." In sum, the district court found that the City could not have achieved the desired reduction in noise without imposing the no-amplification restriction, and that the restriction did not burden substantially more speech than was necessary to achieve the City's objective.

In analyzing the district court's conclusions regarding narrow tailoring, we are guided by the Supreme Court's opinion in Ward and our opinion in Globe Newspaper Co. v. Beacon Hill

-8-

Architectural Commission, 100 F.3d 175 (1st Cir. 1996). Accordingly, we begin with a review of those opinions.

### a. **Ward**

In Ward, the plaintiffs had challenged New York City's requirement that performers on a city concert stage in Central Park use amplification equipment and a sound technician supplied by the city. 491 U.S. at 784. The Court of Appeals had invalidated the requirement, holding that the city's sound-amplification guideline was not narrowly tailored to further the city's interest in limiting the sound emanating from the city's stage because "it has not [been] shown ... that the requirement of the use of the city's sound system and technician was the least intrusive means of regulating the volume." Id. at 797 (quoting Rock Against Racism v. Ward, 848 F.2d 367, 371 (2d Cir. 1988)) (emphasis in original). The Supreme Court emphatically rejected this "least intrusive means" test: "our cases quite clearly hold that restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" 491 U.S. at 797 (quoting United States v. Albertini, 472 U.S. 675, 689 (1985)).

The Court then went on to reaffirm the applicable narrow-tailoring standard, stating first that "the requirement of narrow tailoring is satisfied so long as the ... regulation promotes a substantial government interest that would be achieved less

effectively absent the regulation."  Ward, 491 U.S. at 799

(internal quotation marks omitted).  As the dissent notes, we have

cited this statement in some of our own First Amendment cases.  See

Knights of Columbus v. Town of Lexington, 272 F.3d 25, 33 (1st Cir.

2001); Nat'l Amusements, 43 F.3d at 744.  However, as we recognized

in Globe Newspaper, 100 F.3d at 189-90, see infra, this statement

cannot be separated from the Supreme Court's own qualification of

the meaning of this statement, set forth in Ward:

> To be sure, this standard does not mean that a
> time, place, or manner regulation may burden
> substantially more speech than is necessary to
> further the government's legitimate interests.
> Government may not regulate expression in such
> a manner that a substantial portion of the
> burden on speech does not serve to advance its
> goals.  So long as the means chosen are not
> substantially broader than necessary to
> achieve the government's interest, however,
> the regulation will not be invalid simply
> because a court concludes that the
> government's interest could be adequately
> served by some less-speech-restrictive
> alternative.

Ward, 491 U.S. at 799-800 (emphasis added) (citations omitted).[4]

_____

[4] Without this qualification, the Court's first statement
about the requirement of narrow tailoring ("the requirement of
narrow tailoring is satisfied so long as the ... regulation
promotes a substantial government interest that would be achieved
less effectively absent the regulation") would be little more than
a requirement that the regulation at issue be rationally related to
the identified interest.  To say that a regulation promotes a
substantial government interest is tantamount to saying that the
government interest would be achieved less effectively absent the
regulation.  Therefore, if this first statement were the extent of
the test for narrow tailoring, it would be an extraordinarily easy
one to pass.  A regulation would have to be irrational -- that is,
fail entirely to promote the interests it was designed to promote

To demonstrate the importance of this qualification,[5] the Court went on in Ward to explain why the city's sound amplification guideline was not "substantially broader than necessary to achieve the government's interest." It noted that "[i]f the city's regulatory scheme had a substantial deleterious effect on the ability of bandshell performers to achieve the quality of sound they desired, [plaintiff's] concerns would have considerable force." Id. at 801. It emphasized that the district court had found that the City's sound technician "give[s] the sponsor autonomy with respect to the sound mix . . . [and] does all that he can to accommodate the sponsor's desires in those regards." Id. at 802 (internal quotation marks omitted). Moreover, the Court found no evidence that the City's technician was unable to implement properly the performers' instructions regarding sound quality or mixing. In light of those findings, the Court concluded that "the city's guideline [requiring that performers use the City's amplification equipment and sound technician] has no material impact on any performer's ability to exercise complete artistic control over sound quality." Id. Thus, the Court held

---

--- not to surmount this low hurdle. Recognizing that "narrowly tailored" must mean something more than non-irrational, the Court went on to articulate an additional requirement.

[5] Indeed, when the Supreme Court has cited the Ward narrow-tailoring test in subsequent cases, it has included this important qualification. See Turner Broad., 520 U.S. at 213; United States v. Edge Broad. Co., 509 U.S. 418, 430 (1993).

-11-

that the guideline satisfied the requirement of narrow tailoring because it was "not substantially broader than necessary to achieve the city's legitimate ends."  Id. (internal quotation marks omitted).

### b.  **Globe Newspaper**

In Globe Newspaper, we acknowledged that Ward's "not substantially broader than necessary" requirement is part of the test for narrow tailoring.  A Beacon Hill Architectural Commission regulation banned street furniture, including newspaper boxes, in Boston's historic Beacon Hill neighborhood.  The district court had held that the regulation violated the First Amendment because the Commission had "shown no reason why its interest in preserving the architectural and historic character of the [neighborhood] cannot be met by, for example, subjecting newsracks and other street furniture to the same review process as store-front merchandise racks."  Globe Newspaper, 100 F.3d at 188 (internal quotation marks omitted).

We reversed on the ground that the regulation promoted a substantial government interest in aesthetics that would have been achieved less effectively absent the regulation, and that it did so without burdening substantially more speech than necessary.  Id. at 188-89.  We explained that

> [w]hile the district court correctly considered the fact that less-burdensome alternatives exist, it [gave] too much weight to that fact alone.  In so doing, it

-12-

> essentially discount[ed] from the equation
> _Ward_'s inquiry into whether the [regulation]
> promotes the Commission's interests such that
> they would be achieved less effectively absent
> the [regulation].

_Id._ at 189 (internal quotation marks and alterations omitted). Importantly, however, we declared that "less-burdensome alternatives must be considered in connection with the inquiry into whether, absent the challenged regulation, the government's interests are achieved less effectively," and cautioned that "courts are not merely to defer to the government's subjective judgment." _Id._ at 190 (emphasis added).

We observed in _Globe Newspaper_ that while the Commission "could have adopted a less drastic solution," it had "carefully calculated the costs and benefits" associated with potential solutions to the problem of street furniture. _Id._ We concluded that "[t]he path [the Commission] chose to follow -- eliminating the newsracks altogether -- [was] the most effective solution aimed at reducing visual clutter and preserving the [neighborhood's] historic character." _Id._ In other words, while not engaging in a least-restrictive means analysis, we emphasized that the Commission had weighed the alternatives before it, and we pointed out that an obvious alternative to the ban on street furniture -- requiring that newsracks be designed to "blend in" to the neighborhood -- would have been less effective in achieving the Commission's anti-clutter objective than an outright ban. _Id._ at 190-91. For our

-13-

purposes, the essential point is that we emphasized in <u>Globe</u> <u>Newspaper</u> that the narrow-tailoring test requires the district court to consider whether the regulation challenged on First Amendment grounds sweeps more broadly than necessary to promote the government's interest. That consideration, in turn, cannot be done without some evaluation of the alternative measures put in issue by the parties.

### c. The District Court's Rationale

As explained <u>supra</u>, the district court found the ban on amplification narrowly tailored because (1) the restriction serves the City's interest in noise reduction; (2) this objective could not be achieved without the restriction; (3) the restriction does not burden more speech than necessary; and (4) Casey could still convey her message, but without the aid of an amplifier. Although we conclude that the record supports the district court's first proposition -- that the restriction advanced the City's interest in noise reduction -- it does not support the other three. Thus, the district court overlooked <u>Ward</u>'s requirement that the means chosen cannot be "substantially broader than necessary to achieve the government's interest." 491 U.S. at 800.

### i. The Restriction Serves the City's Interest in Noise Reduction

We agree with the district court that the ban on amplification serves the City's interest in noise reduction, as it limits the volume of noise performers can generate to the sound-

-14-

production capacity of their unamplified voices and instruments. The restriction was implemented to protect residential neighbors of A&O, and the Supreme Court has recognized that the government has "a substantial interest in protecting its citizens from unwelcome noise," an interest that is "perhaps at its greatest when government seeks to protect the well-being, tranquility, and privacy of the home." Id. at 796 (internal quotation marks omitted). Nevertheless, as we have explained, the mere fact that the ban on amplification serves the City's interest in noise reduction is not enough to satisfy the narrow-tailoring requirement.

### ii. The City's Objective Could Not Be Achieved Without the Restriction

The district court stated that without the no-amplification restriction, "the City would be unable to control effectively the volume of music . . . emanating from [A&O]." This statement implies that less-burdensome alternatives to the ban on amplification do not exist. But the record does not support the district court's assertion. Casey and A&O suggest that the City's noise-reduction objective could be achieved by enforcement of the City's noise ordinance. See Newport, R.I., Ordinances ch. 8.12 (Noise Abatement) (setting maximum decibel level of 75 for districts zoned "limited business"). This may or may not be so. However, as a matter of logic, reliance on the noise ordinance would be less restrictive than a total ban on amplification because

-15-

it would permit the use of amplifiers at levels that did not exceed the decibel limit set in the noise ordinance. Yet the City did not explain why it could not have relied on this less-burdensome alternative to the no-amplification restriction. See Globe Newspaper, 100 F.3d at 190-91.

### iii. The Restriction Does Not Burden More Speech Than Necessary

There is no support in the record for the district court's conclusion that the restriction does not burden more speech than necessary to achieve the City's interest in preventing excessive noise. See Ward, 491 U.S. at 802 (upholding regulation that was not substantially broader than necessary). Neither in the district court's opinion nor in the record is there any explanation of why the alternative advanced by the plaintiffs -- enforcement of the City's noise ordinance -- would not have achieved the City's interests as effectively as the amplification ban, while substantially diminishing the burden on speech. This approach is in sharp contrast to Ward, where the Court cited specific alternatives the City had rejected and its reasons for doing so.

In Ward, the Court explained that New York had rejected the idea of a fixed decibel limit for all performers using the bandshell "because the impact on listeners of a single decibel level is not constant, but varies in response to changes in air temperature, foliage, audience size, and like factors." Id. at 786. The city had also rejected the idea of using its own

-16-

technician to operate equipment supplied by the performer, "because the city's technician might have had difficulty satisfying the needs of [performers] while operating unfamiliar, and perhaps inadequate, sound equipment." Id.; see also Globe Newspaper, 100 F.3d at 190 ("Designing the newsracks to better 'blend in' . . . would promote the Commission's interest by reducing their 'unsightliness.' It would not achieve, however, as effective a reduction in 'the visual clutter . . . .'"). By contrast, the district court's opinion gives no indication as to why the City of Newport could not have relied on the noise ordinance to achieve its objective.

We do not see how the "substantially broader than necessary" determination could be made in this case absent some consideration of the alternative of enforcing the noise ordinance. Far from being a hypothetical possibility conjured up by appellants, the noise ordinance is on the books, is unmistakably designed to address the problem of excessive noise, and has been enforced against A&O in the past. There is no indication in the record that such enforcement is not effective in achieving the City's noise-reduction objective.[6]

We emphasize, however, that the City need not prove that the no-amplification restriction is the least restrictive means of

---

[6] Indeed, when appellants were cited for excessive noise in June of 1999 it was for violating the noise ordinance, rather than the no-amplification restriction on their license.

-17-

achieving its objective of controlling excessive noise.  Any such requirement is clearly proscribed by the precedents.  <u>Ward</u>, 491 U.S. at 798.  However, if enforcing the noise ordinance would effectively achieve the City's noise-reduction objective, and the burden on speech imposed by the no-amplification restriction is substantially broader than the burden that would be imposed by enforcing the noise ordinance, the no-amplification restriction may not meet the narrow tailoring test.

Inescapably, the application of the narrow tailoring test entails a delicate balancing judgment by the court. See <u>Blount</u> v. <u>SEC</u>, 61 F.3d 938, 946 (D.C. Cir. 1995) (regulations of speech must, "by virtue of the narrow tailoring requirement . . . , strike an appropriate balance between achieving [the government's] goals and protecting constitutional rights");  <u>Henderson</u> v. <u>Lujan</u>, 964 F.2d 1179, 1184 (D.C. Cir. 1992) ("Despite the seemingly mathematical character of the metaphor, the Supreme Court in fact applies [the narrow-tailoring requirement] as a balancing test . . . ."). First Amendment plaintiffs often argue that a regulation sweeps too broadly and that less burdensome alternatives are available to accomplish the government's objective.  The government responds that the proposed alternatives would be less effective in achieving its objective.  The trial court is then required to balance the competing interests under the narrow-tailoring standard, mindful that the government is not required to choose the least intrusive

-18-

means of advancing its interests. Here, however, the court did not engage in any balancing analysis, deferring instead to the unsupported assertion of the City that the no-amplification restriction in A&O's license was the only effective means of addressing the noise problem.

The City calls to our attention Carew-Reid v. Metropolitan Transportation Authority, 903 F.2d 914 (2d Cir. 1990), which held that a ban on the use of amplifiers on New York City subway platforms was narrowly tailored to the city's interests in "elimination of excessive noise" and "public safety" (the concern was that amplified music interfered "with police communications, the public address system . . . and the work of track crews"). Id. at 917. The district court had enjoined enforcement of the ban, finding that "the goal of noise reduction could be achieved by enforcing the 85 decibel limit" applicable to musical performances on subway platforms. Id. The Second Circuit held that the district court had "improperly relied on the perceived availability of a less-restrictive alternative to the amplifier ban -- the use of decibel meters." Id. at 917-18. It explained that the proposed alternative would be impractical: "The noise regulation requires that decibel measurements be taken at a distance of five feet from the music's source. The difficulties in making such measurements on a crowded subway platform with riders rushing on and off trains are apparent . . . ." Id. at 918.

-19-

Although a crowded subway platform in New York City seems far removed from a residential neighborhood in Newport, Rhode Island, there might be practical problems or administrative burdens that complicate the enforcement of a noise ordinance in this quieter setting. Such considerations are certainly relevant in evaluating whether a proposed alternative would effectively achieve the City's objective. See id. However, this record is silent on any practical problems or administrative burdens that would render enforcement of the noise ordinance an ineffective alternative to the no-amplification restriction.[7]

Nevertheless, the dissent states that the record establishes that "the noise ordinance clearly failed to address the community's concerns and, as such, cannot be considered an effective alternative." Respectfully, that is not so. The scattered references to the Noise Ordinance at the City Council meeting on June 9, 1999 where the license restrictions were adopted do not amount to evidence that enforcement of the noise ordinance

_____

[7] Carew-Reid does assert that Ward "makes clear that the less-restrictive alternative analysis has no part in the review of a time, place or manner regulation." Id. We believe this reasoning reflects a misreading of Ward, which rejected any requirement that the means chosen be the least restrictive. 491 U.S. at 798. Ward does not say that the existence of less restrictive alternatives plays no part in the narrow tailoring analysis. Indeed, we said in Globe Newspaper that the existence of "numerous and obvious less-burdensome alternatives ... is certainly a relevant consideration," just not a controlling one. 100 F.3d at 189-90 (quoting City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 418 n.13 (1993)).

-20-

was considered and rejected as ineffective.  Here is the sum and substance of these references:

- Councilor Sardella, questioning the requirement that an applicant list the specific types of instruments that performers would be permitted to play, said: "entertainment is entertainment and as long as someone doesn't violate the noise ordinance I don't believe we should be restricting them to whether they have a flute player, a guitar player, or a vocalist."

- Casey explained that "it was my fault last Friday that we went over the . . . noise ordinance"

- Doug Stevenson (a neighbor) said: "I don't even think it's an issue of violation of any Noise Ordinance, it's just the fact that we didn't have this noise before and now we do and we have to deal with it and we don't like it."

- Ms. Tarigo (unidentified) said: "last week so we could adhere to that City ordinance of the decibels of 65" (the language that precedes these words is illegible).

As we have explained, at the district court the burden was on the City to show that the no-amplification restriction did not burden substantially more speech than necessary to achieve the City's noise-reduction objective.  See Fox, 492 U.S. at 480.  The City did not meet this burden simply by submitting evidence that the noise ordinance was mentioned at the meeting at which the no-amplification restriction was adopted.  Indeed, the City itself has not argued -- either in its motion for summary judgment or on appeal -- that the Council considered the alternative of enforcing the noise ordinance and concluded that it would be ineffective. Nor has the City supplemented the record of the Council meeting

with evidence supporting its view that the no-amplification restriction is narrowly tailored, as it was free to do at the district court.

The dissent is correct that residential neighbors were unhappy about the noise emanating from A&O. However, it is mere speculation to say that enforcing the noise ordinance was an ineffective alternative to the no-amplification restriction when there is no indication in the record that the City had made any attempt to enforce it beyond the one incident documented in the record.

**iv. Casey Could Still Convey Her Message Without Amplification**

As its final basis for concluding that the ban on amplification was narrowly tailored, the district court stated that appellants "could still convey their respective messages, but . . . without the aid of an amplifier." Appellants respond, with the support of uncontradicted affidavits, that amplifiers are not used simply to take a "message" and make it louder while holding constant its content. To be sure, amplification may be necessary to convey a message, and appellants advance the argument that amplification is required for Casey's voice to be heard over the chatter of A&O's patrons. However, as appellants point out, amplifiers are also used to create new "messages" that cannot be conveyed without amplification equipment. Amplification enables performers to boost the relative volume of quiet instruments, such

as the bass and the lower registers of the human voice, and to adjust the tonal qualities of voices and instruments without necessarily increasing the overall volume of the performance.[8] Much modern music simply cannot be performed without the use of amplifiers. Thus the ban on amplification has a direct and immediate effect on the expression at issue. The record therefore does not support the district court's conclusion that appellants "could still convey their . . . messages" without amplification. Without amplification, some of the messages are not conveyed at all.

The Supreme Court observed in Ward that "[i]f the city's regulatory scheme had a substantial deleterious effect on the ability of bandshell performers to achieve the quality of sound they desired, [plaintiff's] concerns would have considerable force." 491 U.S. at 801. The Court emphasized that there was no evidence in the record that the quality of performances had been impaired by the City's regulatory scheme. On the contrary, it declared that "the city's guideline has no material impact on any performer's ability to exercise complete artistic control over sound quality." Id. at 802. Here, in contrast, there is evidence of a "deleterious effect" on the "quality of sound" Casey has been able to produce. Indeed, the regulation precluded outright the

---

[8] The use of amplification to adjust the relative volume and tonal qualities of voices and instruments is called "mixing."

-23-

performance of certain songs that require her to sing quietly in a low register with amplification.

In sum, we conclude that the district court erred in its application of the <u>Ward</u> test for narrow tailoring to the facts of this case. The record does not support the district court's conclusion that the City's means were not substantially broader than necessary to achieve the government's interest.

### 3. Alternative Channels

Although the failure of the record to support the district court's conclusion that the no-amplification restriction is narrowly tailored to serve a significant governmental interest requires that we vacate the judgment below, we nevertheless note that the ban on amplification at A&O does "leave open ample alternative channels of communication," and thus satisfies the third prong of the <u>Ward</u> test. 491 U.S. at 790 (internal quotation marks omitted). Appellants assert unpersuasively that "[t]here is no alternative for Laurel Casey to find a means to convey her artistic message to an audience of over 90 people on a Saturday night in a restaurant in Newport without having the benefit of an amplifier." However, the restrictions imposed on performers at A&O do not prevent Casey from performing at other establishments in Newport unencumbered by the same restrictions.

-24-

## B. No Amplification of Instruments

The district court held that appellants lacked standing to challenge the restriction on amplification of instruments (but not singing) that has been in force since 2000. In the district court's view, which the City reflects in its brief, Casey and A&O are endeavoring to challenge the no-amplification restriction "on behalf of" other musicians. We disagree with this characterization of appellants' claims, and hold that both Casey and A&O have standing to assert violations of their own First Amendment rights.

"The basic requirements for Article III standing are that the petitioner is someone who has suffered or is threatened by injury in fact to a cognizable interest, that the injury is causally connected to the defendant's action, and that it can be abated by a remedy the court is competent to give." Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 55 (1st Cir. 2001). As a singer who performs with a band, Casey's "expression" encompasses more than just her voice. It is the music she produces in conjunction with her band that constitutes her expression. If the quality of Casey's performance has been affected by the ban on the amplification of her accompanists, she has suffered an injury in fact to a cognizable interest (her interest in performing her music as she wishes to perform it); the injury is causally connected to the restriction the City placed on A&O's entertainment license; and the district court has the power to remedy the injury (by enjoining

-25-

enforcement of the restriction on amplification of instruments). Casey therefore has standing to challenge the restriction on the amplification of instruments. See id.

A&O also has standing to challenge the restriction on the amplification of instruments. If, as appellants allege, the restriction has impaired the quality of Casey's performances, A&O has suffered an injury in fact to a cognizable interest (a reduction in the quality of the entertainment it offers its customers); the injury is causally connected to the restriction on its entertainment license; and the district court has the power to remedy the situation (by declaring the restriction unconstitutional). See id.

Despite concluding that appellants lacked standing to challenge the ban on amplification of instruments, the district court went on to declare that even if appellants did have standing, its analysis of the total ban on amplification applied equally to the ban on amplification of instruments. We have held that the district court erred in finding that the total ban on amplification was narrowly tailored to serve a significant governmental interest. We conclude likewise with respect to the ban on amplification of instruments. In restating its conclusion about the total ban on amplification, without additional analysis, the district court repeated its error of neglecting to consider the viability of the less-burdensome alternative of enforcing the City's noise

ordinance. We therefore remand to the district court for consideration of appellants' challenge to the no-amplification-of-instruments restriction under the framework described in this opinion.[9]

## C. No Singing

The district court found that the no-singing restriction in force for two weeks in June of 1999 was a valid regulation of speech. Casey and A&O argue that the no-singing restriction was "facially invalid," as it "had the effect of utterly suppressing Ms. Casey's right to perform." They also assert that there is no rational basis "for discriminating between one form of instrument, the human voice," and "other instruments such as pianos and guitars."

Frankly, we can make little sense of appellants' facial invalidity argument, at least as they express it. They seem to argue that a ban on singing could never be permissible under any circumstances. Stated so sweepingly, that is an untenable proposition. Appellants also make an equally unavailing argument that the no-singing requirement is not content neutral, hoping to invoke strict scrutiny.[10] See Arkansas Writers' Project, 481 U.S.

---

[9] For the reasons given in connection with the total ban on amplification, the ban on amplification of instruments does satisfy Ward's content-neutrality prong.

[10] As we have explained, "[t]he principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the

-27-

at 231 (requiring state to show that content-based regulation of speech is "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end") (citation omitted). However, appellants do seem to argue, barely, that the no-singing restriction suffers from the same narrow-tailoring infirmities that afflict the restrictions on amplification. Based on our analysis <u>supra</u>, we conclude that the record does not support the district court's holding that the no-singing restriction is narrowly tailored to serve a significant governmental interest. Thus the no-singing restriction too must be addressed by the district court on remand.

## III.

To meet the narrow tailoring requirement set out in Ward, the City was required to establish that the challenged restrictions do not burden substantially more speech than necessary to achieve

---

message it conveys." <u>Ward</u>, 491 U.S. at 791. The district court found that

> the [City] did not place the "no singing" restriction on [A&O's] entertainment license because it disagreed with the message plaintiffs sought to convey. Rather, the [City] imposed the restriction . . . in order to address the complaints defendants received from [A&O's] residential neighbors concerning the excessive and disturbing noise emanating from the restaurant during the late night hours.

Appellants point to nothing in the record suggesting that the no-singing restriction was motivated by the content of Casey's performances, or by specific animus toward singing as opposed to other forms of musical expression. We therefore agree with the district court that the restriction is content neutral.

-28-

its interest in noise reduction. The City has failed to carry its burden on this point. The record is devoid of any explanation of why the alternative of enforcing the City's noise ordinance -- an alternative that is on the books, is designed to address the problem of excessive noise, and has been enforced against A&O in the past -- would not have achieved the City's objective as effectively as the amplification ban, while placing a substantially lesser burden on speech. Absent some evidence of this in the record, the district court had no basis for deciding whether the challenged restrictions are, or are not, substantially broader than necessary to achieve the City's objective.

We conclude, therefore, that the district court erred in its application of the test for narrow tailoring established in Ward and applied in Globe Newspaper, and hence the judgment entered for the City must be vacated. However, there is no basis in law for ordering the entry of judgment for appellants. The proper narrow-tailoring analysis remains to be done and, depending on the outcome of that analysis, damages issues must be resolved. We therefore remand to the district court for further proceedings consistent with this opinion.

**Judgement vacated. Remanded for further proceedings consistent with this opinion.**

**- Concurring and Dissenting Opinions Follow -**

**McAULIFFE**, <u>District Judge</u> **(concurring)**. I agree with and concur in Judge Lipez's reasoning and conclusion -- that the record requires further development and additional narrow-tailoring analysis remains to be done. However, I am less confident than Judge Lipez that the City of Newport's amplification ban is content neutral. The record discloses that the City's sole intent in imposing the license restrictions at issue here was to limit the volume of sound emanating from Asterix & Obelix, in an effort to accommodate its residential neighbors. But, by banning all amplified music, the City effectively, albeit unwittingly, banned a whole host of musical instruments and, necessarily, the unique musical messages that can only be produced by those instruments. And, ironically, the ban will not necessarily insure an acceptable level of noise control -- Casey could, for example, sing to the accompaniment of snare drums, but not amplified flutes.

In the world of modern music, "amplified" is not synonymous with "made louder." Electronic musical instruments can only produce sound through a process of electronic amplification, but those instruments are not inherently louder than acoustic or unamplified instruments. A modern synthesizer, for example, can make sound only by means of electronic amplification, yet that amplified instrument easily and faithfully mimics the sounds produced by a wide range of acoustic instruments such as pianos, harps, flutes, acoustic guitars, violins, drums, etc. Moreover,

-30-

the synthesizer can reproduce those musical sounds as softly and quietly as desired. Yet, the synthesizer falls within the City's ban. An electronically amplified Aeolian Harp can produce the same "soft floating witchery of sound" as nature's own, but the volume is more easily controlled on the amplified version.

So, while the City did not impose the amplification ban because of any overt disagreement with the messages conveyed by amplified musical instruments, thus, arguably, making the ban content neutral, I believe the ban is sufficiently over-reaching to give rise to what the Supreme Court referred to in Ward v. Rock Against Racism, 491 U.S. 781, 792 (1989), as an argument of "much force," i.e., that the City has impermissibly interfered with the artistic judgment of performers at A&O. In Ward, the Court noted that "[a]ny governmental attempt to serve purely esthetic goals by imposing subjective standards of acceptable sound mix on performers would raise serious First Amendment concerns . . . ." Id. at 793. Here, the City's regulation of expressive activity within A&O may well not be content neutral because it appears to impose subjective standards of instrument selection on performers and may not be "justified without reference to the content of the regulated speech," id. at 791 (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984)), notwithstanding the absence of official disagreement with the artistic messages conveyed by amplified instruments. See Police Dept. of Chicago v. Mosley, 408

U.S. 92 (1972) (holding that picketing ban imposed to prevent disruption of school was not content neutral when the ban allowed picketing on some topics but not others); Carey v. Brown, 447 U.S. 455 (1980) (same).

The governmental regulation in Ward was not intended to, and did not in fact, interfere with artistic expression. But here, the regulation singles out certain musical instruments and thus "has a direct and immediate effect on the expression at issue," by suppressing it, and does so without any apparent justification, given the substantial disparity between the ban's expansive reach and the noise-control interests the ban purports to serve.

With that reservation -- that the license restriction may not be content neutral -- I join in Judge Lipez's opinion.

**TORRUELLA, <u>Circuit Judge</u> (Dissenting)**. With due respect, I disagree with my colleagues regarding whether the licenses in question are narrowly tailored. While the majority correctly recounts the holdings of both <u>Ward</u> v. <u>Rock Against Racism</u>, 491 U.S. 781 (1989), and <u>Globe Newspaper, Co.</u> v. <u>Beacon Hill Architectural Commission</u>, 100 F.3d 175 (1st Cir. 1996), it overstates the burden for finding that a time, place, and manner restriction is narrowly tailored. In fact, despite pronouncements to the contrary, the majority essentially elevates the narrowly tailored requirement to something approaching a least restrictive means test by requiring that proposed alternatives always be considered. The majority also ignores crucial evidence in the record which supports the district court's finding that the licensing requirement was narrowly tailored. My own review of the evidence and the relevant law leads me to the conclusion that the City has met its burden of showing that the licenses are narrowly tailored.

The majority understands <u>Globe Newspaper</u> as imposing a requirement on courts to consider less burdensome alternatives in deciding whether a challenged regulation is narrowly tailored. In fact, the court did say, as the majority points out, that "less-burdensome alternatives must be considered." 100 F.3d at 190. However, this statement can only be understood in context. In <u>Globe Newspaper</u>, the district court had found that a general ban on street furniture, including newspaper racks, in Beacon Hill was not

-33-

narrowly tailored because less burdensome alternatives existed. 100 F.3d at 188. In overturning that decision, the court pointed out that those alternative regimes had been considered and rejected as ineffective. Id. at 188-89.[11] Simply, the lower court rested its decision on the availability of alternative regulations and ignored ample evidence showing that those alternatives were ineffective. It was against this background that the court commented that less-burdensome alternatives must be evaluated to see whether they are as effective as the challenged scheme.

Here, the situation is very different. Appellants do not challenge the City's enactment of a general licensing scheme regulating entertainment establishments.[12] Rather, appellants complain about the City's specific refusal to grant A&O a more comprehensive entertainment license. As part of that challenge, appellants point to the City's noise ordinance, positing that its enforcement would be a less-burdensome alternative to a license which covers only certain forms of entertainment. There is no

---

[11] A similar situation confronted the Supreme Court in Ward. There, New York City specifically considered a variety of solutions to its excessive noise problem and rejected all of them as ineffective. 491 U.S. at 785-87.

[12] I further note that it is very unlikely that such a challenge could survive, given that such schemes are generally within a city's powers. Fantasy Book Shop, Inc. v. City of Boston, 652 F.2d 1115, 1121 (1st Cir. 1981) (holding that "licensing of routine commercial operations in an attempt to limit noise, traffic and disruption is clearly within a state's constitutional power").

-34-

evidence, or even a suggestion, that the City actually considered utilizing the noise ordinance instead of the licensing scheme when it came to A&O.[13]  This is entirely predictable.  The controversy over A&O's application arose at a City Council meeting when the City considered the renewal of annual entertainment licenses for the coming year.  It was not in the context of deciding what regulatory regime would best balance noise pollution reduction against allowing full artistic expression.  To exempt A&O from the normal licensing scheme, in favor of utilizing the noise ordinance, would have been a strange result, to say the least.

Furthermore, existing law does not generally support the proposition that alternatives must be considered when deciding whether a regulation is narrowly tailored.  In Knights of Columbus, Council No. 94 v. Town of Lexington, 272 F.3d 25 (1st Cir. 2001) (hereinafter Knights of Columbus), a local group brought a challenge to a regulation that totally banned the erection of unattended structures on the historic town green.  Id.  The plaintiffs-appellants suggested that the town could have achieved its purpose with less restrictive alternatives.  Id. at 32.

---

[13]  The record does suggest that the City had addressed its concerns about noise pollution in another forum: a Noise & Nuisance Task Force.  The reference to this task force is fairly ambiguous, and neither side presents further information about its conclusions or its actual purpose.  Furthermore, there is no suggestion, by either side, that this task force dealt specifically with the problem posed by A&O.  From the limited information available, it appears that this task force addressed only general concerns.

However, the court concluded that the town did not have to implement or experiment with alternatives before employing a total ban.  Id. at 33. In contrast to the limited restrictions in this case, Knights of Columbus presents a fairly extreme regulation. Nevertheless, the town's failure to consider alternatives did not lead the court to find the regulation unconstitutional.

In fact, the appropriate inquiry is not whether alternatives exist, which the regulating body must show are ineffective.   Rather, the inquiry is whether "the State's articulated rationale actually supports restrictions placed on particular conduct." New England Council of Carpenters v. Kinton, 284 F.3d 9, 27 (1st Cir. 2002); accord Gun Owners' Action League, Inc. v. Swift, 284 F.3d 198, 212 (1st Cir. 2002) (upholding a ban on using human-shaped targets at certain gun clubs under intermediate scrutiny without considering less restrictive alternatives); Knights of Columbus, 272 F.3d at 33.  Certainly, that inquiry can include an examination of the alternatives considered by regulating body, see, e.g., Globe Newspaper, 100 F.3d at 188-89, but not every case requires such an inquiry.  This is one such case.

The record clearly shows that the City limited A&O's license in response to neighborhood complaints about excessive noise.  In fact, despite these complaints, the City gave A&O the

same license it had in the prior year.[14]  The City just refused the request for an expanded license.  The record supports only one inference: that the City balanced the interests of A&O against those of its neighbors.  This was entirely appropriate.  See Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 744 (1st Cir. 1995) ("[The regulation] promotes the substantial government interest of preserving tranquility--an interest that, as [the town's] past experience demonstrates, would not be achieved as effectively absent the regulation.").

Furthermore, even if I were to adopt the majority's conclusion that the City must show that available alternatives were ineffective, I would find that the City has met its burden.  The majority concludes that "the City gave no explanation as to why it could not have relied on this less-burdensome alternative [enforcing the noise ordinance] to the no-amplification restriction."  Actually, the record clearly shows that the noise ordinance was ineffective.  A&O had violated the noise ordinance only once, but the neighbors complained about incessant noise.  One neighbor told the City, "So, I don't even think it's an issue of violation of any Noise Ordinance, it's just the fact that we didn't have this noise before and now we do and we have to deal with it

_____

[14]  Originally, the City did place an additional restriction on A&O's license by forbidding singing.  However, the record is clear that this restriction was lifted shortly after it was imposed and that it was imposed on the mistaken belief that the prior license had not included permission for a vocalist.

and we don't like it."  The noise ordinance clearly failed to address the community's concerns and, as such, cannot be considered an effective alternative.[15]

While believing the record clearly shows that the noise ordinance is ineffective, I reiterate my earlier point: the City only needs to show that the issued licenses were narrowly tailored to the problem and not that all available alternatives are ineffective.  Regardless of the standard employed, the City clearly meets its burden, and the judgment of the district court should be affirmed.  Therefore, I respectfully dissent.

---

[15]  Contrary to the majority's assertion, I do <u>not</u> find that the City considered and rejected the noise ordinance as ineffective.  Rather, I simply find that the noise ordinance <u>is</u> ineffective, apart from any consideration by the City.