**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SANTA MONICA NATIVITY SCENES COMMITTEE, a California non-profit association, | No. 13-55011 |
| *Plaintiff-Appellant*, | D.C. No. 2:12-cv-08657-ABC-E |
| v. | |
| CITY OF SANTA MONICA, a municipal corporation, *Defendant-Appellee*. | OPINION |

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, District Judge, Presiding

Argued and Submitted
February 6, 2015—Pasadena, California

Filed April 30, 2015

Before: Michael J. Melloy,* Jay S. Bybee,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Bybee

---

* The Honorable Michael J. Melloy, Senior Circuit Judge for the U.S. Court of Appeals for the Eighth Circuit, sitting by designation.

# SUMMARY[**]

## Civil Rights

The panel affirmed the district court's order dismissing a complaint brought by the Santa Monica Nativity Scenes Committee seeking to continue the decade-old practice of exhibiting nativity scenes during the month of December in Palisades Park, Santa Monica, California.

The Committee challenged the constitutionality of the City of Santa Monica's Ordinance No. 2401, which repealed an exception to the City's general ban on "unattended displays" in its parks. The repealed exception had permitted certain unattended "Winter Displays" in the City's Palisades Park every December, using a lottery system to allocate the available space.

The panel held that the heckler's veto doctrine had no application in this case, which involved the City's generally-applicable repeal of a special exception to its policy of excluding unattended displays from its parks. The panel held that the repeal was a content-neutral time, place, and manner regulation.

The panel held that the Committee's Establishment Clause claim was without foundation. The panel determined that the City had several secular rationales for enacting Ordinance 2401—*e.g.*, improving the aesthetics of Palisades Park and alleviating administrative burdens on the City. The

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

panel further held that it was not plausible that, considering Ordinance 2401 in context, a "reasonable observer" would conclude that its primary effect was to communicate a message of disfavor toward Christianity.

## COUNSEL

William J. Becker (argued), The Becker Law Firm, Los Angeles, California; Michael J. Peffer, Pacific Justice Institute, Santa Ana, California, for Plaintiff-Appellant.

Yibin Shen (argued), Deputy City Attorney, Jeanette Schachtner, Chief Deputy City Attorney, Barry A. Rosenbaum, Senior Land Use Attorney, Heidi Von Tongeln, Deputy City Attorney, Santa Monica, California, for Defendant-Appellee.

## OPINION

BYBEE, Circuit Judge:

No trip to Santa Monica, California, is complete without a visit to Palisades Park—a picturesque strip of land 14 blocks long that overlooks Santa Monica State Beach and the Pacific Ocean and is regarded as the "crown jewel" of the City's park system. Beginning in about 1955, every year during December, local residents erected a series of large dioramas in the Park depicting various scenes from the biblical story of Christmas. The display consisted of 14 booths, each 18 feet long and filled with life-sized mannequins and decorations. Putting up and taking down this elaborate display was a significant undertaking, and in 1983,

the nonprofit Santa Monica Nativity Scenes Committee was organized to manage the yearly construction of the dioramas.

In 1994, the City prohibited the construction of unattended displays—*i.e.*, large, multi-day installations—in its parks, but it nonetheless continued to allow the nativity scenes. Subsequently, in 2003, the City Council enacted an exception to the general prohibition on unattended displays. This "Winter Display" exception authorized unattended displays during the month of December, and only in Palisades Park. Under the "Winter Display" rule, all members of the community, not just the Committee, were permitted to put up displays, and display space was to be allocated on a first-come, first-served basis.

The Winter Display system functioned without incident in its first few years of existence, during which time the only applicant who requested substantial display space was the Committee. In 2011, however, applications for Winter Display space surged. That year, a number of atheists who opposed the placement of religious displays in Palisades Park applied for Winter Display space in what the Committee alleges was a coordinated attempt to keep the space away from the Committee and other religious groups. The City used a lottery system it had created to allocate the available space, and the atheists received the majority of the display spots. The Committee and the atheists both vowed to flood the display-space lottery with even more applications in 2012.

Rather than continue the lottery system and expend the effort necessary to process all of these expected applications, the City elected to repeal the Winter Display exception and keep the Park free of all unattended displays. The Committee responded by suing the City, alleging that the repeal

ordinance violated the Committee's right to free speech because it was an unconstitutional "heckler's veto." The Committee also alleged that the repeal violated the Establishment Clause by conveying the message that the City disapproved of Christianity.

Neither of these allegations constitutes a viable claim for relief under the First Amendment. The heckler's veto doctrine, which applies in situations where a particular speaker is silenced because his speech invites opposition, disorder, or violence, has no application in this case, which involves the City's generally-applicable repeal of a special exception to its policy of excluding unattended displays from its parks. The repeal was a content-neutral time, place, and manner regulation, not a heckler's veto. The Committee's Establishment Clause claim, meanwhile, is without foundation. We therefore affirm the district court's order dismissing the Committee's complaint under Federal Rule of Civil Procedure 12(b)(6).

I

In the early years of the nativity scenes' existence, the City of Santa Monica had no formal regulations dealing with private, unattended structures on public park land, and the City allowed and even encouraged the yearly display of the Committee's nativity scenes. In 1994, the City enacted an ordinance prohibiting the erection of any "tent, lodge, shelter, or structure" in city parks without authorization from the City. Following the enactment of this ordinance, the City issued "community events" permits for the nativity scenes each year.

In 2001, however, the City adopted a new "Community Events Ordinance" that did not cover multi-day events or installations. The Community Events Ordinance's more restrictive scope meant that the City could no longer permit multi-day, unattended displays such as the nativity scenes as "community events." In 2001 and 2002, the nativity scenes were thus "installed with the City's knowledge but without permits." The City subsequently received inquiries from both the Committee and City residents about the legal status of the nativity scenes.

In order to provide a legal framework that would allow the "long-standing tradition" of the nativity scenes to continue while respecting content neutrality, the City Council passed an ordinance in 2003 that modified the general prohibition on "structures" in City parks, adding an explicit exception for so-called "Winter Displays." The ordinance defined these displays as "[u]nattended installations or unattended displays in Palisades Park . . . during the month of December in an area designated by City Council resolution." The ordinance provided that, if the amount of Winter Display space requested was greater than the area that the City Council had allotted, spaces would be allotted on a first-come, first-served basis, "irrespective of the content of [each] display or installation and irrespective of the identity of the person or persons responsible for the display." The City Council subsequently passed a separate ordinance specifying an area of Palisades Park roughly two city blocks long as the area available for Winter Displays.

The first-come, first-served system for Winter Displays was in place from 2003 until 2010. During this period, the number of requests for space in the Winter Display area never exceeded about half of the total area that the City Council had

allotted, or one city block. The Committee continued to display its 14 nativity scenes each year.

In 2010, the demand for Winter Display space increased. The City received three applications for space; two of these applications requested the same space in the same city block, which had never happened before, and for the first time, all of the space in the two city blocks that the City Council had designated was allocated to applicants. The Winter Displays filled one city block and also included "two sizeable displays" in the second block. One of the three applicants that year was Damon Vix, an atheist who opposed the nativity scenes' presence on City property. Vix erected only a single display in the space he was assigned, leaving the rest of his area empty. The display was a chain-link fence surrounding a signboard bearing a quote from Thomas Jefferson: "Religions are all alike—founded upon fables and mythologies."

The City anticipated that demand for Winter Display space would increase even more in 2011 and accordingly revised its Winter Display guidelines to create a lottery system that could be used to allocate space fairly in the event that multiple requests were submitted the same day. The City divided the area of the Park allotted for Winter Displays into 21 separate "spots" and allowed applicants to request up to nine spots each.

In the 2011 application cycle, Vix and several other atheists each applied for the maximum number of spots. The City received 13 applications requesting a total of 109 spots—far more than the 21 spots available—and was required to run the lottery it had set up. In the lottery, two of Vix's confederates received nine spots each, Chabad of Santa

Monica (a Jewish religious organization) received one spot, and the Committee—which came in fourth in the lottery—received two spots. As a result, the Committee had space for just three of the 14 nativity scenes it traditionally erected. The competition for display space attracted both local and national attention; the *New York Times* published a story in December 2011 describing Vix's opposition to the nativity scenes and proclaiming the City to be "embroiled in a seasonal controversy it has somehow avoided for decades." Jennifer Medina, *Where Crèches Once Stood, Atheists Now Hold Forth*, N.Y. Times, Dec. 22, 2011, at A28.

In early 2012, the City Attorney, Marsha Jones Moutrie, submitted two separate reports to the City Council in which she recommended that the Council eliminate the legal exception permitting Winter Displays in Palisades Park. In these reports, Moutrie explained that, because the First Amendment prohibited the City from picking and choosing which displays to allow in the Park during December, the City had only two options: it could continue with the lottery system it had in place, or it could repeal the Winter Display system altogether.

Moutrie recommended the latter option. She explained that Santa Monica residents wanted to "preserve the aesthetic qualities" of the Park and their ability to "look at the ocean vista" for which the Park was renowned, rather than continue to allow the Winter Displays. She also reported that, according to City staff, the lottery system for display space was "time consuming and costly" to operate, requiring the investment of hundreds of hours of staff time—a problem that was likely to intensify in the future because the groups involved had indicated that they planned to "flood" the lottery process in future years "to increase their odds of being

allocated more spaces."  Moutrie concluded that eliminating the Winter Display exception would "serve the purpose[s] of resolving the controversy, eliminating legal risks, conserving the staff time and resources necessary to operate a constitutionally valid regulatory system, conforming usage of Palisades Park to the long standing, City-wide standard which prohibits unattended displays in parks, and protecting the views of the park and ocean."

The City Council agreed with Moutrie's conclusions and, on June 26, 2012, it unanimously adopted Ordinance 2401, which repealed the Winter Display exception.  Three months later, the Committee filed suit in the Central District of California against the City and the seven members of the City Council, alleging violations of the First Amendment's Free Speech and Establishment Clauses and of the Fourteenth Amendment's Equal Protection Clause.  The Committee prayed for declaratory relief, an injunction against the City's "policy . . .  of banning private unattended displays in Palisades Park," nominal damages, and attorneys' fees.

The Committee moved for a preliminary injunction a day after filing its complaint.  After a hearing, the district court denied this motion, explaining that the Committee had not shown a likelihood of success on the merits of any of its constitutional claims.[1]

---

[1] The district court's denial of the Committee's motion for a preliminary injunction is before this court as part of the present appeal.  Because we affirm the district court's Rule 12(b)(6) dismissal of the complaint, however, we need not separately address the question whether the denial of the Committee's motion for a preliminary injunction was proper. *See, e.g.*, *Cal. ex rel. Younger v. Mead*, 618 F.2d 618, 622 (9th Cir. 1980).

While the motion for a preliminary injunction was pending, the defendants moved to dismiss the complaint for failure to state a claim. After denying the preliminary-injunction motion, the district court granted this 12(b)(6) motion as to the City; the Committee agreed voluntarily to dismiss the individual defendants with prejudice.

In its dismissal order, the district court held that both of the Committee's First Amendment claims were legally deficient. The court determined that the City's policy of banning all unattended displays in Palisades Park was content neutral, rejecting the Committee's argument that the ban should be deemed a content-based "heckler's veto." After concluding that the ban was content neutral, the district court held that it was a valid time, place, and manner regulation and that the Committee had therefore failed to state a claim under the Free Speech Clause.

The district court also held, under the tripartite framework of *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971), that the total ban did not violate the Establishment Clause. The district court dismissed the Committee's First Amendment claims with prejudice.[2] The Committee timely appealed.

We review the district court's dismissal of the complaint under Rule 12(b)(6) de novo. *Gant v. Cnty. of L.A.*, 772 F.3d 608, 614 (9th Cir. 2014). As part of this assessment, "we inquire whether the complaint's factual allegations, together with all reasonable inferences, state a plausible claim for relief." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*,

---

[2] The order did not address the Committee's equal-protection claim, which the Committee voluntarily dismissed with prejudice.

637 F.3d 1047, 1054 (9th Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

## II

We begin with the Committee's claim under the Free Speech Clause. When analyzing the validity of a regulation under this Clause, we "apply a forum analysis" whose first step involves determining what type of forum is affected by the regulation. *Flint v. Dennison*, 488 F.3d 816, 830 (9th Cir. 2007). "Once the forum is identified, we determine whether [the] restrictions on speech are justified by the requisite [legal] standard." *Id.* (internal quotation marks omitted).

All agree that Palisades Park—the forum that Ordinance 2401 finally and completely closed to unattended displays—is a traditional public forum. *See, e.g.*, *Berger v. City of Seattle*, 569 F.3d 1029, 1036 (9th Cir. 2009) (en banc) (noting that parks are "categorized for First Amendment purposes as traditional public fora"). In such a forum, the government's ability to regulate speech is "sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). A content-based speech regulation in a traditional public forum is subject to strict scrutiny and will be upheld only if it is narrowly drawn to serve a compelling governmental interest. *Id.*

Content-neutral time, place, and manner regulations, on the other hand, are permitted in traditional public forums if the regulations are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels of communication. *Berger*, 569 F.3d at 1036 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Both this court and the Supreme Court have indicated,

moreover, that a content-neutral ban on all private unattended displays in a city's parks is very likely to be a legitimate time, place, and manner regulation. *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761 (1995); *id.* at 783–84 (Souter, J., concurring); *Am. Jewish Cong. v. City of Beverly Hills*, 90 F.3d 379, 384 (9th Cir. 1996) (en banc) ("The City constitutionally could ban all unattended private displays in its parks."); *see also Lubavitch Chabad House, Inc. v. City of Chi.*, 917 F.2d 341, 347 (7th Cir. 1990) ("We are not cognizant of[] . . . any private constitutional right to erect a structure on public property. If there were, our traditional public forums, such as our public parks, would be cluttered with all manner of structures."). Indeed, the Committee concedes, in light of this case law, that such a ban is constitutional as long as it is content neutral.

Much depends, therefore, on whether Ordinance 2401 is content based or content neutral—the question to which we now turn.

A. *Content Neutrality*

The Committee does not dispute that Ordinance 2401 is facially content neutral. Nor could it. By repealing the legal exception that previously allowed for Winter Displays, the ordinance effectively bans all unattended displays in Palisades Park. It does not discriminate between particular displays based on their content.

The Committee argues, however, that Ordinance 2401 should be *considered* content based pursuant to the "heckler's-veto" doctrine, which holds that a regulation of speech is to be deemed content based when "listeners react to speech based on its content and the government then ratifies

that reaction by restricting the speech in response to listeners' objections." *Ctr. for Bio-ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 789 (9th Cir. 2008) (emphasis omitted). The doctrine prohibits the government from pointing to the "reaction of listeners" to speech as a "secondary effect" justifying that speech's regulation; in other words, the government may not regulate speech on the grounds that it will cause its hearers anger or discomfort. *Id.* (citing *Boos v. Barry*, 485 U.S. 312, 321 (1988)). If speech provokes wrongful acts on the part of hecklers, the government must deal with those wrongful acts directly; it may not avoid doing so by suppressing the speech.

The Committee contends that Ordinance 2401 was a heckler's veto because the City Council enacted it in response to the atheists' objections to the Committee's nativity scenes. It argues that the City reacted to the controversy that had begun to brew over the competing claims for display space in Palisades Park by opting to suppress speech there altogether. It cites to City Attorney Moutrie's reports, both of which reference the importance of resolving the "controversy" that had arisen over the Winter Displays, and to the public remarks of individual City Council members during deliberations over Ordinance 2401, when a number of Council members expressed fear that the display controversy would escalate and turn ugly.

As the Committee is forced to concede, however, this case is far afield from the heartland of the heckler's veto doctrine. The prototypical heckler's veto case is one in which the government silences *particular* speech or a *particular* speaker "due to an anticipated disorderly or violent reaction of the audience." *Rosenbaum v. City & Cnty. of S.F.*, 484 F.3d 1142, 1158 (9th Cir. 2007); *see also Zamecnik v.*

*Indian Prairie Sch. Dist. #204*, 636 F.3d 874, 879 (7th Cir. 2011) (heckler's veto doctrine applies when particular, protected speech is "met by violence or threats or other unprivileged retaliatory conduct"); Richard F. Duncan, *Just Another Brick in the Wall: The Establishment Clause as a Heckler's Veto*, 18 Tex. Rev. L. & Pol. 255, 264 (2014) ("The classic heckler's veto case arises when someone wishes to speak in a public forum and someone else threatens to violently stop the speech."). Indeed, every appellate decision applying the heckler's veto doctrine of which we are aware involved the restriction of particular speech due to listeners' actual or anticipated hostility to that speech.[3] The

---

[3] *See, e.g.*, *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 126–27, 134 (1992) (ordinance allowing parade permit fees to be adjusted based on expected cost of maintaining order during the parade was content based because the adjustments would "depend on [an] administrator's measure of the amount of hostility likely to be created by the speech based on its content"); *Terminiello v. City of Chi.*, 337 U.S. 1, 5 (1949) (disorderly conduct ordinance violated First Amendment because it "permitted conviction of [a defendant] if his speech stirred people to anger, invited public dispute, or brought about a condition of unrest"); *United States v. Marcavage*, 609 F.3d 264, 283 (3d Cir. 2010) (park rangers engaged in content-based restriction of protester's speech when they removed him from a public street near the Liberty Bell because they were "concerned by visitors' reactions to [his] message and [his] signs[]"); *Ctr. for Bioethical Reform*, 533 F.3d at 789 (state law, if applied to protesters driving truck with anti-abortion messages around a public school, would be an unconstitutional heckler's veto because it "permitted [the speech] until the students and drivers around the school reacted to it, at which point the speech was deemed disruptive and ordered stopped"); *Lewis v. Wilson*, 253 F.3d 1077, 1081–82 (8th Cir. 2001) (state's refusal to allow driver to have license plate with number "ARYAN-1" was an unconstitutional heckler's veto because the decision was based on the "mere possibility of a violent reaction" to the license plate by other drivers); *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. Dist. of Columbia*, 972 F.2d 365, 374 (D.C. Cir. 1992) (city's proposal to

Committee's heckler's veto claim would thus have some force if the City, in response to the atheists' complaints and applications for space, had decided that no *religious* displays could henceforth be erected in Palisades Park.

But the City did no such thing. Instead, as the district court noted below, the City adopted a generally applicable regulation meant to balance "competing speech rights" rather than to "suppress[] . . . a [particular] message because of the audience's reaction to it." In 2010 and 2011, the City was confronted for the first time in its history with a profusion of requests for display space in Palisades Park—requests that the City reasonably believed the First Amendment required it to treat equally, given that the Park is a traditional public forum.[4] The City made an effort to accommodate both the Committee and the other applicants for space, but the City soon came to the conclusion that the administrative problems and intramural strife caused by the Winter Display lottery system outweighed the benefits of continuing it. To address the problems and restore communal peace, the City adopted

---

restrict location of KKK march due to the "threat of listeners' violent reaction to the message being delivered" was content based).

[4] In its briefs, the Committee argues at great length that the City could have excluded the atheists from the Winter Display system because the atheists' displays were not intended to celebrate "[l]egitimate winter holidays." Whether the First Amendment in fact permitted the City to exclude the atheists from the Winter Display system is not, however, relevant to the outcome here, and we therefore decline to render an advisory opinion on that issue. It is sufficient for present purposes to note that the City set for itself the laudable goal of treating all applicants equally and that, once the City concluded that perpetuating the Winter Display system would be more trouble than it was worth, the City addressed the problem with a neutral regulation that banned all unattended displays, whether religious or secular.

an evenhanded regulation—Ordinance 2401—that removed the legal exception that permitted the "Winter Displays." The ordinance did not single out the Committee's speech and, accordingly, was not the stuff of a traditional heckler's veto.

We acknowledge that, described at a high level of abstraction, Ordinance 2401 sounds a bit like a heckler's veto. The repeal of the Winter Display exception did, in some sense, ratify the atheists' opposition to the nativity scenes; the atheists started a "controversy" over the scenes, and the City reacted by excluding the scenes (along with all other unattended displays) from Palisades Park. We would expand the heckler's veto doctrine significantly, however, if we held here that the doctrine applies to neutral regulations that do not target particular speech, and the logic underlying the heckler's veto doctrine does not support our doing so. The heckler's veto doctrine is concerned with the possibility that *particular* speech will be wrongfully excluded from the marketplace of ideas merely because it is "offensive to some of [its] hearers." *See Bachellar v. Maryland*, 397 U.S. 564, 567 (1970). That possibility is absent when a regulation applies to *all* speech and does not allow for arbitrary enforcement based on particular speech's "offensive[ness]." *See Ovadal v. City of Madison*, 416 F.3d 531, 536–37 (7th Cir. 2005) (city's policy of prohibiting signs hung from highway overpasses if they "impair[ed] traffic safety" was content based because officers could "decide on an ad hoc basis whether to allow the protest to continue depending on how drivers react to the signs," but a general ban on all signs on overpasses would "certainly be a legitimate place and manner restriction because it would be clearly content-neutral").

We find no support in federal case law, moreover, for the proposition that a city that chooses to permit unattended displays in its public spaces for some period of time becomes estopped by the First Amendment from withdrawing that permission if those displays happen, eventually, to invite "controversy." Indeed, we impliedly rejected that very notion in our decision in *American Jewish Congress v. City of Beverly Hills*. There, the city of Beverly Hills had a general policy against unattended displays on public property but made an exception every year for a large menorah erected in a park during Chanukah. 90 F.3d at 380–81. Two individuals unsuccessfully applied for permission to erect a "winter solstice" display and a Latin cross in the park, and the denial of their applications led to a challenge to the city's permitting policy for displays. *Id.* at 381. This court held that Beverly Hills' policy violated the First Amendment because it was susceptible to arbitrary application. *Id.* at 385. In the course of reaching this conclusion, we commented in dicta that the city "constitutionally could ban all unattended private displays in its parks." *Id.* at 384. We did not suggest that the city was barred from adopting such a ban now that a controversy had arisen over the menorah's privileged status.

The First Circuit came to a similar conclusion in *Knights of Columbus, Council #94 v. Town of Lexington*. 272 F.3d 25 (1st Cir. 2001). That case involved a crèche that had been erected on the Battle Green in Lexington, Massachusetts, for many decades—first by the town itself and then, from 1973 onward, by two fraternal organizations. The crèche "long ha[d] been a source of friction within" Lexington, and some residents had "complained bitterly about its presence on the Green." *Id.* at 29. In the fall of 1999, the town received "requests to allow a wide range of other religious structures on the Green for comparable periods," including displays

relating to Judaism, "witchcraft," and "the Egyptian Sun God Ra." *Id.* The town, which was unwilling to "compromise the aesthetic and historic elements of the Green" by permitting all of these displays, decided to ban the erection of unattended structures on the Green. *Id.* at 29–30. The fraternal organizations responsible for the crèche sued, alleging a violation of their freedom of speech.

The First Circuit upheld the ban. The court explained that, because the ban was "facially neutral," the only basis on which the court could hold that the town's action was content based was the fraternal organizations' claim that "the regulation's primary purpose [was] to prevent display of the crèche." *Id.* at 31. The court determined, however, that "nothing in the record . . . evince[d] a content-based animus against the crèche." *Id.* at 32. On the contrary, the record indicated that the town had acted out of a desire to protect the Green and "treat all religious expression even-handedly." *Id.* The *Knights of Columbus* court did not, in other words, consider Lexington's ban on unattended displays to be a heckler's veto directed at the crèche, even though that ban had been enacted to resolve a controversy over display space that the crèche had previously monopolized.

We similarly conclude that Ordinance 2401 is content neutral. The fact that the speakers who succeeded in crowding the nativity scenes out of Palisades Park were atheists who explicitly opposed the scenes' display is surely a bitter pill for the Committee, and it may appear to some observers that the City's decision to ban unattended displays from Palisades Park affected the Committee disproportionately. By 2011, however, the nativity scenes were living on borrowed time. The scenes owed their long, uninterrupted, and near-exclusive occupation of the Park—a public forum open to all—largely

to the fact that for many years, hardly anyone else in the community wished to put up displays there.  That was bound to change sooner or later, and in 2010, it finally did.  By repealing its Winter Display exception, the City did no more than treat all potential displays equally.  *Accord id.* at 32 ("If the [plaintiffs] feel that the burden of the regulation falls most heavily on them, it is perhaps because they are now held to the same standard as all other similarly situated applicants. While the adjustment may not be an easy one, the outcome is inescapably content-neutral.").[5]

B.  *Time, Place, and Manner Regulation*

Although we conclude that Ordinance 2401 is content neutral, that does not mean that the ordinance necessarily was constitutional.  In order to pass constitutional muster as a time, place, and manner regulation, Ordinance 2401 must also be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication."  *Ward*, 491 U.S. at 791.  We have little

---

[5] To say that generally applicable bans on particular forms of speech are content-neutral regulations is not to suggest that such bans will always be constitutional.  On the contrary, the Supreme Court has indicated that such bans are suspect when they suppress more speech than is necessary to accomplish their objectives.  *See, e.g.*, *Martin v. City of Struthers*, 319 U.S. 141, 145–46 (1943) (ordinance prohibiting ringing doorbells for the purpose of distributing handbills violated the First Amendment, because "[d]oor to door distribution of circulars is essential to the poorly financed causes of little people"); *Schneider v. Town of Irvington*, 308 U.S. 147, 162 (1939) (ordinances banning all distribution of literature in public streets in order to prevent litter were invalid under the First Amendment; the better course was for cities to punish "those who actually throw papers on the streets").  In this section of our opinion, we hold only that blanket bans applicable to all speakers are content-neutral.

difficulty, however, in concluding that the ordinance satisfies all of these requirements.

1.  Significant governmental interests

Ordinance 2401 served at least two significant governmental interests:  First, it preserved the aesthetic qualities of Palisades Park and prevented obstruction of patrons' views of the ocean.  The Supreme Court has held on several occasions that governments may regulate speech for aesthetic purposes.  *See, e.g.*, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 296 (1984) (National Park Service could ban camping in certain public parks in order to "maintain[]" the parks "in an attractive and intact condition"); *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 808 (1984) (city of Los Angeles could ban posters on public utility poles in order to combat "visual clutter and blight").  And the City has long manifested its intent to preserve its parks from clutter:  since at least 1994, it has prohibited unattended displays in all parks while making a limited exception for "Winter Displays" in Palisades Park.  Ordinance 2401 simply made that prohibition applicable to all of Santa Monica's parks at all times.

Second, Ordinance 2401 conserved the City's resources. Prior to 2011, coordinating the Winter Displays in Palisades Park had been an easy task for the City's staff; in 2011, however, the staff spent "hundreds of hours" administering the lottery system, and all indications were that the system would become more time-consuming in the future as the number of applications for space increased.  It was permissible for the City to seek to alleviate this burden on its employees' time.  *See, e.g.*, *Clark*, 468 U.S. at 296–97 (National Park Service's total ban on sleeping in certain parks

could be justified on the ground that operating a selective permitting system for camping demonstrations would be an administrative burden on the Park Service).

The Committee dismisses both of these rationales as insignificant and argues that Ordinance 2401 does not further either of them. "Conclusory allegations of law, however, are insufficient to defeat a motion to dismiss." *Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001). The Committee must allege *facts* that show that the Ordinance 2401 did not serve the ends the City said it did, and the Committee has failed to do this. The Committee has no answer whatsoever to the statements by City employees—which the Committee itself reproduced as an exhibit to its complaint—that eliminating the Winter Displays saved the City many hours of staff time, other than stating that it simply does not believe the City. And with respect to the City's stated aesthetic concerns, the Committee has offered only one factual allegation that indicates that those concerns were insignificant: the fact that at the time that the City created the formal Winter Display system in 2003, the City's staff believed that allocating a two-block area of Palisades Park for the displays would not cause problems. This fact does not plausibly show that the aesthetic concerns the City cited *in 2012* to justify Ordinance 2401 were insignificant. The City was entitled to reassess conditions in the Park as it gained experience with the Winter Display system over time, and by 2012, the City was clearly convinced that change was needed.

The Committee also contends that, in any event, the City's stated concerns are not valid bases for regulation because they stem from the "emotive impact" of the Committee's religious speech. But the Committee has not alleged any plausible facts to support this claim. The City's

regulation targeted the aesthetic and logistical problems created by the influx of display space applications in 2011, not the emotional impact of the nativity scenes on people who saw them. The atheists who applied for display space in Palisades Park may have done so in reaction to the presence of the nativity scenes, but that does not mean that any problems that the increased number of applications created for the City are a consequence of the "emotive impact" of the nativity scenes. A regulation impermissibly targets the "emotive impact" of speech only if it is justified by reference to the immediate emotional reaction of listeners. *See Boos*, 485 U.S. at 321 (invalidating ordinance aimed solely at "protect[ing] the dignity of foreign diplomatic personnel by shielding them from speech that is critical of their governments"—protest signs outside of embassies). Ordinance 2401 is not such a regulation.

### 2. Narrow tailoring

We also conclude that Ordinance 2401 was narrowly tailored. Although the Committee points out several steps that the City could have taken to address the problems it identified, short of repealing the Winter Display exception, these observations are irrelevant to the question of narrow tailoring. A time, place, and manner regulation "need not be the least restrictive or least intrusive means" of furthering the government's interests in order to be narrowly tailored. *Ward*, 491 U.S. at 798. Rather, narrow tailoring requires only that a regulation "promote[] a substantial government interest that would be achieved less effectively absent the regulation" and not "burden substantially more speech than is necessary to further" that interest. *Id.* at 799.

There is no question that Ordinance 2401 furthers the City's interests in preserving the aesthetics of Palisades Park and conserving City resources. Nor did the ordinance burden substantially more speech than necessary: unattended displays contribute to clutter and require laborious permitting in ways that other forms of speech, even attended displays, usually do not, and the ordinance affected only unattended displays. *See Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (stating that a regulation is narrowly tailored if it "eliminates no more than the exact source of the 'evil' it seeks to remedy"). The City's regulation therefore satisfies the narrow tailoring requirement.

### 3.   Alternative channels of communication

Finally, we find that Ordinance 2401 leaves open ample alternative channels of communication. As the district court observed, there remain "many alternative avenues" by which the Committee can communicate its religious message: it can erect its unattended nativity scenes on private property, and it can speak in many other ways in Palisades Park, including erecting one-day, attended displays, leafleting, preaching, holding signs, and caroling.[6]

---

[6] During the pendency of this appeal, the City made two requests for judicial notice of various documents that purport to show that, in the years after Ordinance 2401 was passed, the Committee did several of these things, including displaying the unattended nativity scenes on private property and holding live Christmas events in Palisades Park. The pertinent question for our purposes, however, is whether Ordinance 2401 left open ample alternative channels of communication; it does not matter whether the Committee actually availed itself of those alternative channels. We therefore deny the City's two requests for judicial notice on the grounds that the documents to be noticed are irrelevant. *See, e.g.*, *Ruiz v. City of Santa Maria*, 160 F.3d 543, 548 n.13 (9th Cir. 1998) (denying

The Committee offers several arguments why the alternative channels of communication left to it are inadequate. First, it contends that "[a]n alternative is not ample if the speaker is not permitted to reach the intended audience," *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) (internal quotation marks omitted), and that its "intended audience" is visitors to Palisades Park, which it claims is "the optimum location for reaching the greatest number of spectators" in Santa Monica. Even assuming, however, that the Committee is entitled to insist that it be specifically allowed to reach visitors to Palisades Park, the Committee is still able to speak in the Park after Ordinance 2401; it simply cannot do so by erecting large, unattended structures. *Compare Knights of Columbus*, 272 F.3d at 34 (ban on unattended structures on Battle Green left open alternative channels of communication, in part because a creche could still appear on the Green as an attended display), *with Bay Area Peace Navy*, 914 F.2d at 1229 (75-yard security zone around reviewing stand for Navy's "Fleet Week" did not afford pacifist demonstrators ample alternative channels of communication, because it prevented them from reaching their intended audience of visitors to Fleet Week).

Second, the Committee argues that it would be "impractical" for it to arrange for the nativity scenes to be attended displays because the Committee "cannot practically recruit volunteers or afford to pay people to be present" while the displays are up. In general, however, the fact that the alternative channels of communication left open by a regulation are more expensive is not, by itself, sufficient to

---

request for judicial notice, in part because information to be noticed did not bear on the "relevant issue" before the court).

show that those alternative channels are inadequate. *See, e.g.*, *Taxpayers for Vincent*, 466 U.S. at 812 & n.30 (ordinance prohibiting posting of signs on utility poles left open alternative channels of communication, such as speaking in person and distributing literature in the same locations—both of which tactics are presumably more expensive); *Kovacs v. Cooper*, 336 U.S. 77, 88–89 (1949) (fact that "more people may be more easily and cheaply reached by sound trucks" than by other means was not enough to "call forth constitutional protection" for that specific mode of communication).

Finally, the Committee argues in its reply brief that the First Amendment "protects [its] right to choose a particular means or avenue of speech"—*i.e.*, unattended displays. But although we have held that speakers have a First Amendment right to "choose a particular means or avenue of speech . . . to advocate their cause," we have also made clear that "[t]his is not the same as saying that [speakers] have a First Amendment right to dictate the *manner* in which they convey their message within their chosen avenue. Government may regulate the *manner* of speech in a content-neutral way." *Foti v. City of Menlo Park*, 146 F.3d 629, 641–42 (9th Cir. 1998) (although abortion protesters had the right to communicate their message by picketing, city was permitted to regulate the manner of this picketing, *e.g.* by regulating the size and number of their signs). Thus, even assuming that the First Amendment protects the Committee's right to speak through large displays, the City was permitted to limit the manner of that speech by requiring that such displays be attended or erected as part of limited-duration "community events." *See Foti*, 146 F.3d at 641–42; *see also United Bhd. of Carpenters & Joiners of Am. Local 586 v. NLRB*, 540 F.3d 957, 969 (9th Cir. 2008) ("We will not invalidate a regulation merely

because it restricts the speaker's preferred method of communication."). Ordinance 2401, which allows the Committee to disseminate its message in person in many different ways, including attended displays and unattended displays that are part of single-day "community events," therefore leaves open sufficient alternative channels of communication.

Because Ordinance 2401 was a valid time, place, and manner regulation, we affirm the district court's conclusion that the Committee's claim under the Free Speech Clause is not viable and must be dismissed.

## III

The other claim at issue is the Committee's claim that Ordinance 2401 violated the Establishment Clause because it conveyed impermissible "disapproval of and hostility toward the Christian religion." We need not detain ourselves long with this allegation, which falls well short of amounting to a plausible claim for relief.

A regulation violates the Establishment Clause if (1) it lacks a "secular legislative purpose," (2) "its principal or primary effect" is to "advance[ or] inhibit[] religion," or (3) it "foster[s] an excessive government entanglement with religion." *Lemon*, 403 U.S. at 612–13 (internal quotation marks omitted).[7] The Committee makes no attempt to argue

---

[7] As a mode of analysis for Establishment Clause inquiries, *Lemon* has been much criticized both inside and outside the Court—and sometimes ignored by the Court altogether, *see, e.g.*, *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014). Nevertheless, *Lemon* remains the Court's principal framework for applying the Establishment Clause. *See Cnty. of*

that Ordinance 2401 creates entanglement between the City and religion, focusing instead on the first two prongs of the *Lemon* test.

The Committee's allegation that Ordinance 2401 lacked a secular legislative purpose is plainly inadequate. A regulation "will stumble on the purpose prong 'only if it is motivated *wholly* by an impermissible purpose.'" *Kreisner v. City of San Diego*, 1 F.3d 775, 782 (9th Cir. 1993) (emphasis added) (quoting *Bowen v. Kendrick*, 487 U.S. 589, 602 (1988)). As we have explained, the City had several secular rationales for enacting Ordinance 2401—*e.g.*, improving the aesthetics of Palisades Park and alleviating administrative burdens on the City. That is enough to satisfy *Lemon*'s first prong. *See id.* ("A reviewing court must be 'reluctant to attribute unconstitutional motives' to government actors in the face of a plausible secular purpose." (quoting *Mueller v. Allen*, 463 U.S. 388, 394–95 (1983))).

As for the Committee's allegation regarding *Lemon*'s second prong—*i.e.*, that Ordinance 2401 has the primary effect of "convey[ing] disapproval of religion"—we find it simply implausible. The history we have recounted shows that, far from disapproving the nativity scenes, the City welcomed and accommodated the Committee's displays for over fifty years and repealed the Winter Display exception only when it was convinced that no other course of action made sense. Indeed, a third party might well have had grounds to sue the City on the grounds that the Winter Display system itself violated the Establishment Clause by

*Allegheny v. ACLU*, 492 U.S. 573, 592 (1989) ("[*Lemon*'s] trilogy of tests has been applied regularly in the Court's later Establishment Clause cases.").

unduly *privileging* religion. Thus, it is not plausible that, considering Ordinance 2401 in context, a "reasonable observer" would conclude that its primary effect was to communicate a message of disfavor toward Christianity. *See Am. Family Ass'n, Inc. v. City & Cnty. of S.F.*, 277 F.3d 1114, 1122 (9th Cir. 2002).

We conclude that Ordinance 2401 passes muster under the *Lemon* test and that the Committee has failed to state a claim under the Establishment Clause. The district court properly dismissed this claim under Rule 12(b)(6).[8]

IV

We do not doubt that the Committee resents the way in which the City curtailed its traditional way of celebrating the Christmas season in Palisades Park, but its grievances do not

---

[8] The Committee's opening brief argues in passing that the district court erred by dismissing this action with prejudice. We disagree. We are skeptical that the Committee—which never asked the district court for leave to amend its complaint—can now be heard to complain that the district court did not grant such leave. *See, e.g.*, *Alaska v. United States*, 201 F.3d 1154, 1163–64 (9th Cir. 2000) ("Where a party does not ask the district court for leave to amend, [a] request on appeal to remand with instructions to permit amendment comes too late." (alteration and internal quotation marks omitted)). And in any event, leave to amend is not warranted where, as here, "[i]t is clear that no amendment could save [the] complaint." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1026 (9th Cir. 2000). We cannot conceive of any additional facts—and the Committee proffers none—that would cure the deficiencies in the Committee's First Amendment claims. The district court thus did not abuse its discretion by dismissing the case with prejudice. *See, e.g.*, *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993).

state a viable claim that the City violated the First Amendment. The judgment of the district court is

**AFFIRMED.**